**CHICAGO, BURLINGTON & QUINCY RAILROAD, Plaintiff,**

v.

**RAILWAY EMPLOYES' DEPARTMENT, AFL-CIO; System Federation No. 95; International Association of Machinists and Aerospace Workers; International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers; Sheet Metal Workers' International Association; International Brotherhood of Electrical Workers; Brotherhood of Railway Carmen of United States and Canada; and International Brotherhood of Firemen and Oilers, Defendants.**

**Civ. A. No. 630–69.**

United States District Court
District of Columbia.

April 9, 1969.

Francis M. Shea, Shea & Gardner, Ralph J. Moore, Jr., Martin J. Flynn, Washington, D. C., for plaintiff.

James Highsaw, Jr., Edward Hickey, Jr., William J. Hickey, Washington, D. C., for defendants.

## PRELIMINARY INJUNCTION

AUBREY E. ROBINSON, Jr., District Judge.

The Plaintiff Chicago, Burlington & Quincy Railroad having filed a Motion for Preliminary Injunction with supporting memoranda and affidavits; the six defendant labor unions representing shopcraft employees of the plaintiff along with the Railway Employes' Department, AFL–CIO, and System Federation No. 95 of such department having submitted memoranda and affidavits in opposition to the foregoing motion; having heard oral argument by counsel for the parties, the Court makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

(1) Plaintiff is a corporation incorporated under the laws of the State of Illinois engaged in the interstate rail transportation of freight and passengers.

(2) Defendant Railway Employes' Department, AFL–CIO, is a voluntary unincorporated association through which the other named defendants function in their representation of plaintiffs' shopcraft employees under the Railway Labor Act. Systems Federation No. 95 is a branch of the Railway Employes' Department, AFL–CIO.

(3) National rules on the subject of "contracting out" have existed in the railroad industry since World War I. The latest national agreement on the subject was the Mediation Agreement of September 25, 1964. This agreement was signed by representatives of one hundred and forty-seven (147) rail carriers (including plaintiff) and by representatives of the defendants in this action. On March 25, 1968, the defendant labor organizations served on plaintiff a demand for an amendment to the national collective bargaining agreement (hereinafter referred to as the Mediation Agreement). The notice was purportedly served pursuant to Section 6 of the Railway Labor Act [45 U.S.C. § 156 (1964)]. This notice proposed revisions of Articles II and VI of the September 25, 1964, Mediation Agreement.

(4) Article II of the 1964 Mediation Agreement dealt with subcontracting of work. Defendants' Section 6 notice advised plaintiff of the union's desire to revise this article to require special agreement on specific work between the carrier and the general chairman of the craft before work could be subcontracted and to further require special agreement with respect to unit exchange, purchase of new equipment or component parts, and with respect to manufacturing, repairing and rebuilding which was work set forth in the classification of work rules.

(5) Article VI of the 1964 Mediation Agreement provided the machinery for the resolution of disputes arising out of the agreement. Defendants' Section 6 notice advised of the union's desire to amend this Article by broadening the remedy provisions.

(6) Plaintiff filed a counter notice purportedly under Section 6 of the Railway Labor Act. This notice sought the

elimination of all agreements pertaining to the subject matter of Article II and an amendment to Article I of the Mediation Agreement.

(7) Conferences between plaintiff and representatives of defendants concerning these proposed changes in the Mediation Agreement were held but no agreement was reached, plaintiff, from the outset, has insisted that negotiations on the subject matter of the Section 6 notice required notice to and involvement of the other one hundred and forty-six (146) carriers with whom the 1964 Mediation Agreement was signed. Plaintiff has also insisted that the demands are not mandatorily bargainable under the Railway Labor Act. Defendants have maintained a contrary position as to both issues. The services of the National Mediation Board were utilized unsuccessfully, its proffer of voluntary arbitration having been rejected by both parties. Its services terminated effective February 4, 1969.

(8) Defendants assert their present right to strike, post-mediation conferences having also been terminated without success. Unless enjoined such a strike would probably result in the suspension of transportation of passengers and freight on plaintiff's extensive railway system with the consequence that plaintiff would be impeded in its ability and obligation to provide common carrier service in the public interest as required by statute. Many of its employees would be deprived of wages and employment during any such strike. An extended area of the country and many businesses would be deprived of essential transportation services and interstate rail transportation would be seriously impeded to the detriment of private and public business and to the injury and impairment of public safety and health.

(9) There is substantial showing from the history of the relationship between the parties that the subject matter of defendants' Section 6 notice relates to matters that are mandatorily bargainable under the Railway Labor

Act and does relate to "rates of pay, rules, or working conditions" within the meaning of Section 6 of the Railway Labor Act.

(10) There is also a substantial showing from the history of the relationship between the parties that defendants' attempt to modify the national agreement without resorting to the multi-employer bargaining unit which had previously considered the subject matter of the Section 6 notices is a violation of the plaintiff's rights under the Railway Labor Act.

(11) The parties to the Mediation Agreement of 1964, including the parties to this action, are presently engaged in bargaining concerning modification of the "contracting out" provisions of the Mediation Agreement.

*Conclusions of Law*

(1) *The Court has jurisdiction of the parties and the subject matter of these proceedings.*

■ (2) *The March 1968 Section 6 notice served by defendants upon plaintiffs covered matters which are mandatorily bargainable under the Railway Labor Act.* The subjects for mandatory bargaining under the Railway Labor Act are defined in Section 6 merely by reference to "rates of pay, rules, or working conditions." 45 U.S.C. § 156 (1964). But the courts have ratified the practice of the industry so that the duty to bargain has been construed so as to reflect " 'the philosophy of bagaining as worked out in the labor movement in the United States.' That is, 'what carriers must legally bargain about is affected by what is in fact bargained about in the railroad world.' " Brotherhood of Railroad Trainmen v. Akron & B. B. R. Co., 128 U.S.App.D.C. 59, 79, 385 F.2d 581, 601 (1967). The unions' demands with respect to "contracting out" involve matters that have been "in fact bargained about in the railroad world." Indeed, the March 1968 notice dealt with a subject matter which had been bargained about by the Burlington Railroad with its employees in 1962. The notice con-

tained initial proposals substantially similar to the proposals set forth in the defendants' 1962 notice. In addition, the notice dealt with a subject matter which Presidential Emergency Board No. 160 found properly bargainable because of the public interest and because of the impact of carrier practices in regard to "contracting out" upon the employment of the employees represented by defendants. Also the notice dealt with a subject matter which was in fact negotiated upon and became part of a 1964 national agreement between Burlington (and other railroad carriers) and the defendants. *See* Article II, Mediation Agreement of September 24, 1964.

In addition to the fact that "contracting out" has in fact been bargained about by the parties to this suit in the past, it has been explicitly held by the Supreme Court that "contracting out" is a "condition of employment," a term from the National Labor Relations Act, 29 U.S.C. § 158(d) (1964), with substantially the same meaning as "working conditions" in the Railway Labor Act, 45 U.S.C. § 156 (1964). In affirming a decision of the United States Court of Appeals for the District of Columbia, the Court said, "A stipulation with respect to the contracting out of work performed by members of the bargaining unit might appropriately be called a 'condition of employment.' The words even more plainly cover termination of employment which, as the facts of this case indicate, necessarily results from the contracting out of work performed by members of the established bargaining unit." Fibreboard Paper Products Corp. v. N L R B, 379 U.S. 203, 210, 85 S.Ct. 398, 403, 13 L. Ed.2d 233 (1964). Thus, viewed both as a subject about which the parties have bargained in the past and a subject within the statutory language of "rates of pay, rules, or working conditions," the matters contained in the March 1968 Section 6 notices are mandatorily bargainable under the Railway Labor Act.

■ (3) *The issue of "contracting out" must be bargained by the unions with the multi-employer bargaining unit* established by the carriers to deal with this issue. "The Railway Labor Act does not universally and categorically compel a party to a dispute to accept national handling over its protest. Such bargaining is certainly lawful, however. Whether it is also obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and of the historical experience in handling any similar national movements." Brotherhood of Railroad Trainmen v. Atlantic Coast Line R. Co., 127 U.S.App.D.C. 298, 302, 383 F.2d 225, 229 (1967). The subject matter of the parties' current dispute is one that has been handled, historically, on a multi-employer basis by the carriers' designated national representative and the unions. *See* Mediation Agreement of September 25, 1964, *supra.* It is one as to which the unions themselves continue to recognize that multi-employer bargaining is appropriate, as indicated by the fact that most of the defendants served national notices on most of the Nation's carriers which include proposals regarding "contracting out" and which gave rise to national bargaining which is now in progress. Having recognized the National Railway Labor Conference and the Eastern, Western and Southeastern Carriers' Conference Committees as the national representative of the carriers, the unions are not now free to compel the Burlington Railroad to bargain with them on a unilateral basis and thus break up the established multi-employer bargaining unit. When such a pattern of national bargaining has been established and the issues are not unique to the unions' dealing with any specific carrier, then both "the practical appropriateness of mass bargaining on that point" and "the historical experience" in handling the issue in the past make national handling of the matter obligatory. Brotherhood of Railroad Trainmen v. Atlantic Coast Line R. Co., *supra.*

Defendants' contention that the Burlington (and not the other carriers who were parties to the 1964 agreement)

abused the agreement, and that such abuse justifies the unions in making unilateral demands on the Burlington, is without merit, for the 1964 agreement established an arbitration board to decide just such grievances; alleged abuses of the terms of the agreement do not justify abandonment of the agreement itself. *See* Article VI, Mediation Agreement of September 25, 1964, *supra.*

■ (4) *Since both plaintiff and defendants were operating on incorrect legal premises, both failed to comply with the requisites of the Railway Labor Act.* The Court reaches no conclusion on the issue of "good faith" bargaining, for the critical issue is not whether plaintiff and/or defendant failed to bargain in good faith. Rather, the crucial point is that while both complied with many of the formalities of the Act, each relied on incorrect legal positions. Plaintiff's persistent contention that the issue of "contracting out" was not bargainable under the Railway Labor Act, while perhaps not urged in bad faith, was legally unsound and made ultimate agreement an impossibility. Similarly, defendants' belief that Burlington was the proper bargaining unit and its insistence that Burlington negotiate with them on an issue previously decided nationally, while perhaps not held in bad faith, was legally incorrect and made ultimate agreement impossible. Defendant served notice on the improper bargaining representative, while plaintiff maintained a position throughout the negotiations which tended to make those negotiations fruitless. In sum, although perhaps with the best of intentions, neither party bargained in the way contemplated by the spirit and the detailed framework of the Railway Labor Act which was designed to facilitate the voluntary settlement of major disputes.

■ (5) *Having failed to bargain in the way contemplated by the Railway Labor Act, defendants are not free to strike.* "The heart of the Railway Labor Act is the duty, imposed by § 2 First [45 U.S.C. § 152, First (1964)] upon management and labor, 'to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes  *  *  *  in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carriers and the employees thereof.' The Act provides a detailed framework to facilitate the voluntary settlement of major disputes." Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 399, at 377, 89 S.Ct. 1109, at 1115, 22 L.Ed.2d 344 (March 25, 1969). Only after the procedures outlined in the Act "have been exhausted without yielding resolution of the dispute" may the disputants resort to self-help. Id. The procedures outlined in the Act not having been exhausted, we conclude that the unions may not resort to self-help and may therefore be enjoined from striking. Brotherhood of Railroad Trainmen v. Akron & B.B. R. Co., 128 U.S.App. D.C. 59, 91, 385 F.2d 581, 613 (1967).

■ (6) *Section 8 of the Norris-LaGuardia Act does not prevent this Court from enjoining the unions from striking.* Section 8 of the Norris-La-Guardia Act provides that a federal court shall not grant a restraining order or injunction in a labor dispute where the complainant "has failed to comply with any obligation imposed by law which is involved in the labor dispute in question." 29 U.S.C. § 108 (1964). It is equally clear that a party to a dispute under the Railway Labor Act may not resort to self-help until he has exhausted the procedures outlined in the Act, Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., *supra,* and that injunctive relief is sometimes required to "vindicate the processes of the Railway Labor Act." Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. R. Co., 353 U.S. 30, 41, 77 S. Ct. 635, 641, 1 L.Ed.2d 622 (1957). In the instant case, there is an apparent conflict between the dictates of the Norris-LaGuardia Act, which seemingly precludes the granting of injunctive relief requested by a plaintiff whom we have

concluded has not bargained in the way contemplated by the Railway Labor Act, and the Railway Labor Act, which requires the enjoining of a strike by defendants who have not exhausted the procedures outlined in the Act. We cannot resolve the conflict by holding that the Norris-LaGuardia Act is not relevant to railway disputes, for it has been held that Section 8 is clearly applicable to actions to enjoin violations of the Railway Labor Act. Brotherhood of Railroad Trainmen v. Akron & B.B. R. Co., 128 U.S.App.D.C. 59, 92, 385 F.2d 581, 614 (1967). Yet it has also been held that where the provisions of the two Acts conflict, the more specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act. Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 563, 57 S.Ct. 592, 81 L.Ed. 789 (1937). And our own Court of Appeals has outlined the approach to take in analyzing such a conflict: "It may be that in a particular case the District Court might conclude that the imperatives of the Railway Labor Act override Section 8—a statutory focusing so to speak of an equity approach whereby lack of clean hands may be overcome by a balancing of interests, particularly where it is the public interest involved." Brotherhood of Railroad Trainmen v. Akron & B.B. R. Co., supra. This is such a case. "If, as the Supreme Court said in the Chicago River case [353 U.S. 30, 77 S.Ct. 635, 1 L. Ed.2d 622 (1957) supra], the provisions of the Norris-LaGuardia Act and the Railway Labor Act must be accommodated 'so that the obvious purpose in the enactment of each is preserved,' it follows that a strike of a union which has refused to comply with its mandatory duties * * * is illegal and can be enjoined by the courts notwithstanding the provisions of the Norris-LaGuardia Act. * * * [T]he legislative history tends to support the view that (1) it was contemplated in the original Railway Labor Act that the remedy of injunction against strikes and lockouts was not barred prior to the exhaustion of the procedures set forth in the act, and (2) the Norris-LaGuardia Act did not contemplate precluding such injunctive relief." American Airlines, Inc. v. Air Line Pilots Ass'n, International, 169 F.Supp. 777, 788–789 (S.D.N.Y.1958). "It is well settled that injunctive relief may be granted to vindicate the processes of the [Railway Labor] Act regardless of the provisions of the Norris-LaGuardia Act. [Citations omitted.] Thus, parties to a major dispute, while free to resort to a strike following the exhaustion of the mandatory processes of the Act, * * * may be enjoined from striking prior to the exhaustion of such processes." Pan American World Airways v. International Brotherhood of Teamsters, 275 F.Supp. 986, 999–1000 (S.D.N.Y.1967). On the basis of the foregoing, we conclude that injunctive relief to compel compliance with the positive mandates of the Railway Labor Act is not barred by the restrictions of Section 8 of the Norris-LaGuardia Act. Since the purpose of Section 8 is to effectuate the traditional equity policy of the "clean hands" doctrine, our conclusion that Section 8 is no bar to an injunction is reinforced by our earlier finding that the crucial issue is not whether the parties bargained in good faith but that both bargained in reliance on incorrect legal premises. We further conclude that, upon "a balancing of interests, particularly * * * the public interest," Brotherhood of Railroad Trainmen v. Akron & B.B. R. Co., 128 U.S.App.D.C. 59, 92, 385 F.2d 581, 614 (1967), the injunction must issue "in order to avoid any interruption to commerce or to the operation of any carrier," the very purpose of the Railway Labor Act. 45 U.S. C. § 152 (1964).

The Court having entered its findings of fact and conclusions of law, it is this 9th day of April, 1969.

Ordered that Plaintiff's Motion for a Preliminary Injunction be and is hereby granted, and that defendants, the Presidents, Executive Councils, General Chairmen and other officers of any of

the defendants, the agents, employees and members of any of the defendants, and all persons acting in concert with them be and are hereby restrained from authorizing, calling, encouraging, permitting or engaging in any strikes or work stoppages and from picketing the premises of plaintiff, and it is

Further ordered that said preliminary injunction shall be in force until such time as the parties to this lawsuit have bargained within the dictates of the Railway Labor Act and the conclusions of law contained herein, and until the procedures of the Railway Labor Act have been fully exhausted, and it is

Further Ordered that Defendants' Motion for Summary Judgment be and is hereby denied without prejudice.