**ALTON & SOUTHERN RAILWAY CO., et al., Plaintiffs,**

v.

**BROTHERHOOD OF MAINTENANCE WAY EMPLOYES, Defendant.**

Civ. A. No. 94–2365 (TFH).

United States District Court, District of Columbia.

May 28, 1996.

Ralph J. Moore, Dorothy Eugenia Langan, Shea & Gardner, Washington, D.C., for Plaintiffs.

John O'B. Clarke, William G. Mahoney, Highsaw, Mahoney & Clarke, Washington, D.C., for Defendant.

## *MEMORANDUM OPINION*

THOMAS F. HOGAN, District Judge.

Pending before the Court are cross-motions for summary judgment. After consideration of the briefs and oral argument, for the reasons set forth below the Court will grant the plaintiffs' motion for summary judgment and deny the defendant's motion for summary judgment.

## BACKGROUND

On June 29, 1956, President Dwight D. Eisenhower signed into law the National Interstate Highway and Defense Act to construct a system of roadways that would connect America's population to its industry and its cities to its farms. Although the project has been widely acclaimed, at least for some industries, the effects were not entirely positive. One such industry was the railroads. By some accounts, from the mid–1950's through 1993, rail shipment of freight

dropped from accounting for two thirds of the total freight shipped to one third of that total. The impact of the highway system and the greater use of trucks to transport freight resulted in the railroads being forced to take steps to become more efficient and thus more competitive. One of the first areas that the carriers looked to trim their costs were work rules that they considered antiquated, inefficient and unnecessary. Debate over these work rules is what brings the parties back to this Court in another chapter of what has been one of the longest and most contentious struggles in the annals of American labor relations.

The Court has issued multiple opinions in this case and therefore will only briefly recount the background of the case.[1] The plaintiffs are a group of twenty-nine rail carriers. The defendant Brotherhood of Maintenance of Way Employes ("BMWE") is a union representing workers employed by the carriers. Notwithstanding the parties' history of labor disputes, the instant case actually has as its genesis, November 1, 1994, when both the carriers and the BMWE served § 6

notices suggesting changes in wages, health and welfare benefits, and work rules.[2] In collective bargaining, the carriers designated the National Carriers' Conference Committee ("NCCC") to act as their authorized national multi-employer bargaining representative to represent them in negotiations with railway labor unions, including the BMWE. However, the BMWE rejected the idea of multi-employer bargaining, seeking instead to bargain locally with the individual carriers.[3]

The carriers, essentially anticipating the BMWE's reluctance to enter into multi-employer bargaining, filed the instant lawsuit on November 1, 1994. The carriers sought a declaratory injunction declaring that the BMWE is obligated to bargain on a national handling basis with the NCCC with respect to the issues raised in the current round of bargaining, an injunction ordering the BMWE to bargain on a national-handling basis with the NCCC, and an injunction enjoining the BMWE from engaging in premature self help activities.[4] The carriers assert

---

**1.** The Court's first opinion in this case is not published. *See Alton & Southern Ry. Co. v. Brotherhood of Maintenance of Way Employes,* Civil Action No. 94–2365, 1995 U.S.Dist. LEXIS 2740 (D.D.C. Feb. 20, 1995) (denying cross-motions for preliminary injunction), *aff'd,* No. 95–7042, 1995 U.S.App. LEXIS 12153 (D.C.Cir. Apr. 25, 1995) and *Alton & Southern Ry. Co. v. Brotherhood of Maintenance of Way Employes,* Civil Action No. 94–2365, 1995 WL 338544 (D.D.C. Feb. 21, 1995) (same), *aff'd,* No. 95–7042, 1995 WL 311450 (D.C.Cir. Apr. 25, 1995). The Court's second opinion is published. *See Alton & Southern Ry. Co. v. Brotherhood of Maintenance of Way Employes,* 883 F.Supp. 755 (D.D.C. 1995) (granting carriers' request for preliminary injunction). The Court's third opinion is also published. *See Alton & Southern Ry. Co. v. Brotherhood of Maintenance of Way Employes,* 899 F.Supp. 646 (D.D.C.1995) (denying union's request to alter and amend); *aff'd Alton & Southern Ry. Co. v. Brotherhood of Maintenance of Way Employes,* 72 F.3d 919 (D.C.Cir.1995).

**2.** The seeds for the instant case can probably be traced back to the 1988 round of collective bargaining between the parties. During that round of bargaining, the BMWE and several other unions were unable to reach agreements with the carriers. As a result, the President of the United States created Presidential Emergency Board No. 219 ("PEB 219") to investigate and report on the disputes. After conducting its investigation, PEB issued a report, which contained a

series of recommendations. While some unions reached settlements, others, including the BMWE, instituted a strike on April 17, 1991. On the following day, Congress stepped in and ended the strike by enacting Pub.L. No. 102–29, 105 Stat. 169 (1991). As a result of the action of Congress and the Special Board created by Pub.L. No. 102–29, the BMWE entered into an imposed agreement with the carriers.

**3.** Multi-employer bargaining refers to situations where more than one railroad carrier designate the same representative for collective bargaining purposes. Under this system, a union ordinarily negotiates one agreement that covers workers on all of the carriers that have chosen to bargain as a group. This is also called national handling. The Court will use these terms interchangeably throughout this Memorandum Opinion. The alternative to national handling is local handling. Local handling refers to bargaining between a union and a single carrier.

**4.** This Court issued a preliminary injunction on April 28, 1995, prohibiting the BMWE from "authorizing, encouraging, permitting, calling, engaging in or continuing any strikes, picketing, work stoppages or other self help against the Plaintiffs relating to the dispute or disputes arising from the § 6 notices served in the round of bargaining that commenced on or about November 1, 1994, ..." *See Alton & Southern Ry. Co. v. Brotherhood of Maintenance of Way Employes,* 883 F.Supp. 755 (D.D.C.1995).

that the BMWE's refusal to bargain on a multi-employer basis violates the RLA's requirement to "exert every reasonable effort" to reach an agreement. 45 U.S.C. § 152 First.[5]

The BMWE and its individual General Chairman filed a counterclaim against the carriers seeking a declaratory judgment that it is the carriers who are violating the RLA by refusing to meet with the BMWE's individual representative. The BMWE seeks a declaratory judgment declaring that the carriers' insistence on multi-employer bargaining interferes with its right under the RLA to designate its bargaining representative. The BMWE argues that the RLA gives it the right to decline to participate in multi-employer handling, and that the carriers are interfering with the BMWE's selection of a bargaining representative. 45 U.S.C. § 152 Third.[6]

This Court has previously considered the question of whether the carriers could force the BMWE to bargain nationally. On February 21, 1995, following cross-motions for a preliminary injunction, this Court rejected both the carriers' position that national handling could always be compelled, and the BMWE's argument that national handling was always voluntary.[7] This Court relied principally on the decision in *Brotherhood of R.R. Trainmen v. Atlantic Coast Line R.R. Co.*, 383 F.2d 225, 229 (D.C.Cir.1967), *cert. denied*, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968), where the court of appeals of this circuit had reached a similar Solomon-like conclusion:

what constitutes good faith bargaining in the railroad industry is colored by how parties have actually bargained in the past. The Railway Labor Act does not universally and categorically compel a party to a dispute to accept national handling over its protest. Such bargaining is certainly lawful, however. Whether it is also obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and of the historical experience in handling any similar national movements. The history and realities of crew consist bargaining in this industry impel the conclusion that mass handling was not required by the statute for bargaining on that issue.

*Id.* During consideration of the parties' cross-motions for preliminary injunctions, arguments were raised concerning the continued viability of *Atlantic Coast Line*, particularly in light of more recent holdings from other circuits. The Court, however, concluded that *Atlantic Coast Line* was undisturbed by those other cases and thus remained the law of this circuit.

On March 17, 1995, the carriers filed a second motion for a preliminary injunction. The carriers sought to enjoin the BMWE from engaging in strikes or other forms of self help until the Court addressed the merits of this case. On April 28, 1995, the Court granted the carriers' motion and enjoined the BMWE from engaging in any form of self help related to the dispute until the Court had addressed the merits of this case. The purpose of the Court's injunction was to maintain the status quo during the pendency

**5.** 45 U.S.C. § 152 First reads as follows:
 **First. Duty of the carriers and employees to settle disputes.** It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning the rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the applications of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

**6.** 45 U.S.C. § 152 Third reads as follows:
 **Third. Designation of representatives.** Representatives, for the purposes of this Act, shall be designated by the respective parties without interference, influence, or coercion by either party

over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. . . .

**7.** *See Alton & Southern Ry. Co. v. Brotherhood of Maintenance of Way Employes*, Civil Action No. 94–2365, 1995 U.S.Dist. LEXIS 2740 (D.D.C. Feb. 20, 1995) (denying cross-motions for preliminary injunction), *aff'd*, No. 95–7042, 1995 U.S.App. LEXIS 12153 (D.C.Cir. Apr. 25, 1995) and *Alton & Southern Ry. Co. v. Brotherhood of Maintenance of Way Employes*, Civil Action No. 94–2365, 1995 WL 338544 (D.D.C. Feb. 21, 1995) (same), *aff'd*, No. 95–7042, 1995 WL 311450 (D.C.Cir. Apr. 25, 1995).

of this litigation. Both the Court's preliminary injunction and the denial of BMWE's motion to alter and amend were subsequently upheld by the Court of Appeals.[8]

The carriers maintain that under the facts of this case, national handling is obligatory under the RLA. Convinced that it will be more successful in local bargaining than it will be in national bargaining, the BMWE maintains that it has the right to decline to designate a bargaining agent with authority to engage in multi-employer bargaining. 45 U.S.C. § 152 Third. Moreover, there is little question that the BMWE is driven by its desire to undo what it considers the disastrous results of PEB 219 and Public Law 102–29 by bargaining locally because it believes that this form of bargaining gives it greater leverage and flexibility. According to BMWE, as long as this position is reasonable and not taken in bad faith, this Court may not disturb it.

## DISCUSSION

### A. Standard of Review

A motion for summary judgment will be granted when inspection of the record reveals there to be "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of showing that there is no genuine issue of material fact or that the opposing party has failed to make a showing sufficient to establish the existence of an essential element to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When the moving party has carried its burden, the burden shifts to the nonmoving party to "come forward with 'specific facts showing there is a genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). In reviewing the evidence, a court must draw all reasonable inferences in favor of the non-

movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate in this case as it turns solely on a question of law.

### B. The Meaning of *Atlantic Coast Line*

This Court, having already held that *Atlantic Coast Line* is the law of this circuit, will only briefly revisit that particular issue. However, because the parties have assigned differing interpretations to *Atlantic Coast Line*, it is appropriate to clarify exactly what the decision means. *Atlantic Coast Line* involved an attempt by carriers to "abrogate" existing rules regulating the use of conductors and trainmen, or "crew consist" on yard and road crews. The carriers took the position that a party could demand that national movements always be referred to national handling. 383 F.2d at 228. Conversely, the union argued that a party could never be compelled to accept such handling. *Id.* Striking a middle ground between the parties competing positions, the court of appeals ultimately concluded that whether national handling was obligatory would turn on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and the historical experience in handling similar national movements. 383 F.2d at 229.

Applying that standard, the court of appeals concluded that the crew consist issue was not appropriate for national handling. The court found that there had never been a national crew consist rule and that thousands of existing crew consist agreements had been negotiated at the local level. Particularly significant to the court were findings of a neutral board that had concluded that a national prescription for crew consist was wholly unrealistic. *Id.* at 229. The court concluded that while the procedures of the RLA were purposely long and drawn out to afford a maximum opportunity at resolution, the Act "did not require efforts clearly at war with reality." *Id.*

---

**8.** *See Alton & Southern Ry. Co. v. Brotherhood of Maintenance of Way Employes*, 883 F.Supp. 755 (D.D.C.1995) (granting carriers' request for preliminary injunction). The Court's third opinion is also published. *See Alton & Southern Ry. Co.*

*v. Brotherhood of Maintenance of Way Employes*, 899 F.Supp. 646 (D.D.C.1995) (denying union's request to alter and amend); *aff'd Alton & Southern Ry. Co. v. Brotherhood of Maintenance of Way Employees*, 72 F.3d 919 (D.C.Cir.1995).

This jurisdiction has applied this two-part test a number of times,[9] but the court of appeals has only revisited its holding in *Atlantic Coast Line* once. · In *Delaware & Hudson Ry. v. UTU*, 450 F.2d 603, 611 (D.C.Cir.), *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971), the court of appeals implicitly affirmed the viability of the two-part test articulated in *Atlantic Coast Line* in a discussion of *International Ass'n of Machinists,* 310 F.Supp. 905. While declining to affirm the district court the court of appeals left little doubt that the trial court, which had applied the two-part test of *Atlantic Coast Line,* was correct to do so. *Id.* at 609 (stating that "Judge Corcoran correctly understood the import and implication of our *Atlantic Coast Line* ruling."). In light of *Delaware & Hudson,* this Court determined that *Atlantic Coast Line* was still the law of this circuit and supplied the rule of decision in this case.[10] Nonetheless, the BMWE has called into question the manner is which *Atlantic Coast Line* should be interpreted, and has renewed its argument that because of its § 2 Third claim, *Atlantic Coast Line* has minimal relevance. Each issue shall be discussed in turn.

### 1. *Atlantic Coast Line* as an Objective Determination

BMWE's first argument is that the two-part test of *Atlantic Coast Line* requires that the Court engage in a subjective analysis of the reasonableness or good faith of the parties. In other words, if the BMWE has a reasonable belief that it stands to be more successful in local negotiations, and this position is not taken in bad faith, the Court is without authority to force them to do otherwise. BMWE argues that the duty of *Atlantic Coast Line* as expressed in *Delaware & Hudson Ry. v. UTU*, 450 F.2d 603, 611 (D.C.Cir.), *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971), requires parties to "bargain in good faith, which means the absence of bad faith...." Thus, according to the BMWE, the Court's role is limited to assessing whether the decision to bargain locally is so patently unreasonable as to evidence bad faith. If a party's decision is not taken in bad faith, the prohibition of Section 2 Third, prohibiting the carriers from interfering with the right of BMWE to designate its bargaining agent, trumps the duty to exert every reasonable effort contained in Section 2 First.[11]

The authority of this or any other court is limited by the law which it is bound to apply. In this case, the *Atlantic Coast Line* test is intended to give efficacy to the command of Section 2 First to "exert every reasonable effort to make and maintain agreements ... and to settle all disputes...." In interpreting that language, the open question for a court is what constitutes a reasonable effort. In the view of this Court, the two part "test" of *Atlantic Coast Line* is better viewed as factors for a court to consider in determining whether a demand to bargain in a certain manner is reasonable. *Atlantic Coast Line* requires a court to assess (1) whether the parties have a long history of negotiating in a particular way; and (2) whether it is still appropriate to require the parties to continue to negotiate that way. Only if these two questions can be answered in the affirmative is the court authorized to find a particular form of bargaining is obligatory under the Act.

9. The two part test of *Atlantic Coast Line* was subsequently applied in this jurisdiction at least three other times aside from this case. *See Chicago, Burlington & Quincy R.R. v. Railway Employes' Dep't,* 301 F.Supp. 603, 607 (D.D.C.1969) (Robinson, J.); *International Ass'n of Machinists and Aerospace Workers v. National Ry. Labor Conference,* 310 F.Supp. 905, 912 (D.D.C.1970) (Corcoran, J.); *appeal dismissed,* 463 F.2d 872 (D.C.Cir.1972); *United Transp. Union v. Burlington N., Inc.,* 325 F.Supp. 1125, 1131 (D.D.C. 1971) (Parker, J.).

10. This Court ultimately concluded that it was bound to apply *Atlantic Coast Line,* because

*American Ry. and Airway Supervisors Ass'n v. Soo Line R.R. Co.,* 891 F.2d 675 (8th Cir.1989), *cert. denied,* 498 U.S. 809, 111 S.Ct. 42, 112 L.Ed.2d 19 (1990), and the other cases offered by BMWE did not suggest that *Atlantic Coast Line* was no longer the law of this circuit. *See generally* 883 F.Supp. at 762, n. 7.

11. Interestingly, the BMWE links § 2 First's purported requirement of good faith with § 2 Third's representation protection. In doing so BMWE makes a concession that its principal case, *Soo Line,* was unwilling to make.

■ It necessarily follows that the analysis under *Atlantic Coast Line* is an objective determination as to what is reasonable rather than the subjective standard proffered by the BMWE. Parties could consistently come to court with diametrically opposite views of what was reasonable from their point of view, and likewise regularly disagree about their choices of a bargaining forum. To engage in a subjective analysis would transfer the dispositive determination from the courts to the parties. The *Atlantic Coast Line* test provides a workable method of assessing the parties' respective positions in light of how they have acted in the past as well as whatever changed conditions may exist. What is reasonable (and thus obligatory) under the statute in one circumstance may not be reasonable in another. Courts regularly examine under such an objective standard whether a party's actions in a particular context are reasonable. *See Stringer v. Black,* 503 U.S. 222, 236, 112 S.Ct. 1130, 1139–40, 117 L.Ed.2d 367 (1992) (reasonableness in many contexts is an objective standard); *Alexander v. United States Dept. of Housing and Urban Development, et al.,* 441 U.S. 39, 54, 99 S.Ct. 1572, 1582–83, 60 L.Ed.2d 28 (1979) (statutory use of term "reasonable" incorporated an objective standard). Such an assessment does not require the Court to determine which of the parties' positions is more reasonable, but instead measures the parties' conduct against a hypothetical standard.[12]

■ This is not to say that BMWE's attempt to read a good faith component into *Atlantic Coast Line* is wholly misplaced. However, BMWE's position ultimately fails because it is based on a meaning of good faith inconsistent with that of *Atlantic Coast Line.* In that case the district court had concluded that a union's refusal to accept national handling constituted a "bad faith abrogation of [its] statutory obligations." In direct response to the district court's finding

of bad faith, the court of appeals stated that "[w]hat constitutes good faith bargaining in the railroad industry is colored by how parties have actually bargained in the past." *Id.* In other words, for a party to dramatically depart from previous practice without sufficient basis constitutes bad faith. The BMWE strays far afield when it suggests that this Court would be misconstruing *Atlantic Coast Line* if it were to engage in an assessment of which of two competing positions was more reasonable. In sum, *Atlantic Coast Line* requires the Court to make an objective determination of practical appropriateness and the historical experience of the parties' bargaining in order to determine whether a particular form of bargaining is obligatory under the RLA.

### 2. Relationship of Section 2 First and Third

■ The second open question for resolution is whether application of *Atlantic Coast Line* is altered by the introduction of the § 2 Third representation issue. The BMWE argues that because *Atlantic Coast Line* relies solely on § 2 First, it has little or no application to this case which also implicates a § 2 Third. Instead, BMWE directs the Court's attention to several cases including *Soo Line,* 891 F.2d 675, which involved, like the instant case, both § 2 First and § 2 Third.[13] In *Soo Line,* the Eighth Circuit found that the unions' attempt to force the Soo Line to name the NCCC as its national bargaining representative would violate § 2 Third of the RLA.[14] As this Court has previously stated, the *Soo Line* court relied on principles from the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.* ("NLRA"), in finding that the RLA permits parties to withdraw from multiparty bargaining before negotiations begin. *Id.* at 678–79.

The Court believes that it is bound to apply *Atlantic Coast Line* notwithstanding

---

12. It is worth noting here the emphasis which the court in *Atlantic Coast Line* placed upon the judgment of neutral observers in determining what is practical and appropriate.

13. *See also United Transportation Union v. Grand Trunk W. R.R. Co.,* 901 F.2d 489, 490 (6th Cir.) (per curiam), *cert. denied,* 498 U.S. 815, 111 S.Ct.

55, 112 L.Ed.2d 31 (1990) (limit on a party's right to choose a bargaining representative only exists when a party attempts to withdraw from multi-employer bargaining after negotiations have begun).

14. Ironically, it was the union in *Soo Line* that sought to impose national handling.

the representation issue raised by the BMWE. First, the Court is reluctant to allow introduction of a representation question to, in and of itself, defeat national handling. It is difficult to contemplate a situation where a party could not place representation in issue and neutralize the holding of *Atlantic Coast Line*. The court of appeals explicitly rejected the proposition that national handling could never be imposed. To prohibit national handling whenever a representation issue existed would be an open invitation for parties to raise the issue. Such a course of action would effectively overrule *Atlantic Coast Line*—something this Court is unwilling to do.

 More importantly, the Court is not convinced that the rights of a union under § 2 Third include the right to determine the manner under which negotiations will occur. Section 2 Third protects the right of employees to proceed through collective bargaining with the representative of their choosing. As this circuit has counseled: "[t]he concerns expressed by members of Congress and addressed in Section 2, Third and Fourth point strongly toward the conclusion that carriers were to be screened out of any active role in the representation selection process, in order to avoid any possible tainting of employees' free choice of representatives." *Railway Labor Executives Ass'n v. National Mediation Board,* 29 F.3d 655, 668 (D.C.Cir.1994), *amended,* 38 F.3d 1224 (D.C.Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1392, 131 L.Ed.2d 243 (1995). The Supreme Court has stated that:

> Freedom of choice in the selection of representatives on each side of the dispute is the essential foundation of the statutory scheme. All the proceedings looking to amicable adjustments and to agreements for arbitration of disputes, the entire policy of the Act, must depend for the success on the uncoerced action of each party through its own representatives to the end that agreements satisfactory to both may be reached and the peace essential to the

uninterrupted service of the instrumentalities of interstate commerce may be maintained.

*Soo Line,* 891 F.2d at 678 (quoting *Texas & New Orleans R.R. v. Brotherhood of Ry. & S.S. Clerks,* 281 U.S. 548, 569, 50 S.Ct. 427, 433, 74 L.Ed. 1034 (1930)). Moreover, "[v]iolations of Sections 2, Third and Fourth are not limited to representational disputes or circumstances in which the sole purpose of an employer's action is to destroy the union." *Air Line Pilots Ass'n Intern. v. Eastern Air Lines,* 703 F.Supp. 962, 980 (D.D.C.1988), *rev'd on other grounds,* 863 F.2d 891 (D.C.Cir.1988), *cert. dismissed,* 501 U.S. 1283, 112 S.Ct. 38, 115 L.Ed.2d 1119 (1991). It is possible to bring a claim outside a representational context where an employer seeks economic advantage or injury to a union. *Id.* This Court understands the significance of § 2 First, but cannot find within its language the right to dictate the terms under which collective bargaining will occur. This case does not involve allegations of an employer acting in a manner that seeks to injure a union or affect that union's confidence in a choice of representative.

The Court does not believe that the *Soo Line* decision compels a different result. The BMWE argues that the decision in *Soo Line* properly illustrates the relationship between § 2 First and § 2 Third. There is, however, a significant difference between what *Soo Line* means and what BMWE asks this Court to find. The court in *Soo Line* did not find, as the BMWE suggests, that a party's rights under § 2 Third trump the § 2 First obligation to engage in national handling. As previously discussed, the Eighth Circuit found that the only obligation under § 2 First was to negotiate in good faith. 891 F.2d at 677. The court clearly disagreed with the significance of the holding of *Atlantic Coast Line,* going so far as to state that it was "aware of no decision that construes this duty to obligate [a party] to bargain for a national contract through a national bargaining representative." [15] *Id.* at 677–78. Re-

---

15. The Eighth Circuit was apparently concerned about the possibility that once national handling began it could be maintained perpetually. *See Soo Line,* 891 F.2d at 678 (to conclude other than that each proposal under section 6 initiates a new distinct set of negotiations "would, in effect, perpetually bind a [party] to national representation once it agrees to such representation for a

vealing is the suggestion by that court that the two-part test in *Atlantic Coast Line* was "dicta," notwithstanding that three previous courts in this jurisdiction had applied it, and the Court of Appeals that had affirmed its application. Regardless of the future viability of *Atlantic Coast Line*, it does exist today and unlike the Eighth Circuit this Court does not have the luxury of opting to ignore its holding. The failure of the court in *Soo Line* to find any rights beyond bargaining in good faith suggests that had it been a pure § 2 First case the court would have reached exactly the same result. Accordingly, that case offers little guidance in how to square this circuit's assessment as to when national handling is obligatory with the injection of a § 2 Third issue.

▆▆▆ That leaves this as a case of first impression in the circuit regarding the meaning of § 2 Third. In choosing between alternative meanings of a particular statute, the Court should choose that interpretation which allows the various sections of the statute to be read consistently with each other. *See Employees of Dept. of Public Health & Welfare v. Department of Public Health & Welfare, Missouri,* 411 U.S. 279, 290, 93 S.Ct. 1614, 1620–21, 36 L.Ed.2d 251 (1973) (Marshall, J., concurring) ("basic canon of statutory construction that different provisions of the same statute normally should be construed consistently with one another"); *Alabama Power Co. v. United States Environmental Protection Agency,* 40 F.3d 450, 455 (D.C.Cir.1994) ("Statutory text is to be interpreted to give consistent and harmonious effect to each of its provisions."). The meaning of § 2 First is presently determined for this Court's purpose by the decision in *Atlantic Coast Line*. BMWE suggests that § 2 Third protects both the right of a party to select the identity of its representative and the attached right to determine the structure of the collective bargaining. Because such a reading would always allow a party to avoid national handling, it is contrary to this Court's reading of *Atlantic Coast Line* which rejected such a 100% rule. The meaning in which the BMWE asks the Court to construe

§ 2 Third is akin to a party naming as its bargaining representative someone who speaks only a foreign language, and then expecting all subsequent negotiations to be conducted in its representatives' native tongue. Section 2 Third protects a union's right to name the representative of its choice, but it does not entitle that party to dictate other aspects of the bargaining process. In theory, if the BMWE is correct here, a party could conceivably link any bargaining term to its representative and suggest later that such a term fell within the protected rights of § 2 Third.

▆▆▆ A sounder approach to interpreting § 2 Third exists. Section 2 Third is intended to protect the right of a party to designate, without "interference, influence, or coercion," the representative of its choice. This statute is intended to protect the identity of the representative, not the scope of his or her representation. The Court recognizes that an attack on a union's chosen representative can occur either directly or indirectly, and the statute is designed to protect against both. *See Air Line Pilots Ass'n Intern.,* 703 F.Supp. at 980. There is no indication in the language of the statute that suggests that it is intended to provide additional rights such as defining the bargaining form. The carriers have not interfered with the BMWE's right to name any individual as its bargaining representative. Whether there is a basis in the RLA for avoiding multi-employer bargaining or national handling, it does not arise from § 2 Third.

## C. Applying *Atlantic Coast Line*

### 1. Wages, and Health and Welfare

As this Court has previously stated:

After wading through the parties' filings and considering the testimony presented at the hearing on April 26, 1995, it appears to the Court that the carriers and the BMWE have generally participated in national handling of issues concerning wages and health and welfare benefits. Inj. Hr'g Tr. at 60 (testimony of Steven F. Powers). In fact, it appears that the BMWE and other

---

particular bargaining round."). While this Court shares that concern, as discussed at other points

in this opinion, the Court does not agree that *Atlantic Coast Line* compels such a result.

unions have frequently requested national handling of these issues in the past. *See, e.g.,* Aff. of Charles I. Hopkins, Jr. at ¶ 49; *Soo Line,* 891 F.2d at 676.

883 F.Supp. at 762. This Court finds no basis for reaching a different conclusion today.

 There is substantial evidence in the record that is has been the historical practice of these parties to handle wage and health and welfare movements nationally. In particular, since 1932 wage adjustment issues have been handled nationally and no less than twenty-seven national agreements have been reached. *See generally* Plaintiffs Statement of Material Facts ¶¶ 62–64. It has also been the historical experience of the parties to handle health and welfare proposals nationally. *Id.* at ¶¶ 68–77. The first health and welfare benefits agreement was reached in 1954. Since that time the carriers and the BMWE have reached some 20 national agreements. The carriers allege that throughout this period the BMWE has vigorously opposed any change which might result in health and welfare plans becoming local.

 Whether it is also practical and appropriate to handle these matters nationally requires an independent analysis.[16] There is however, sufficient evidence in the record for this Court to conclude that both the national handling of wage and health and welfare issues is practical and appropriate. First, "the practicality of handling wage disputes [ ] on a national basis is readily apparent." 310 F.Supp. at 912. As Judge Corcoran stated:

> Obviously if wage adjustments were to be handled on an individual carrier basis, each carrier would be deterred from settling because the possibility that a competing carrier might obtain better terms; and, by the same token, union members would be

dissatisfied if employees on other railroads doing the same job received higher salaries.

*Id.* at 912. National handling is necessary for the health and welfare plans, in part, because structural changes in plan benefits can be implemented only by the national policyholders of the plans. Even if the structural problems could be dealt with, the give-and-take required of legitimate local negotiations over health and welfare as well as other issues would be incompatible with the survival of national plans.

This Court also finds persuasive the findings of various "neutral observers." For example, the Report of Presidential Emergency Board No. 221, opposed significant wage variations for the BMWE on Conrail, on the grounds that competition among unions would have a destabilizing influence damaging to the public interest. Report of Presidential Emergency Board (No. 221) (May 28, 1992); *see also* Report to the President by Emergency Board (No. 157) (Dec. 23, 1963). Moreover, the necessity of handling health and welfare on a national basis was recently affirmed by PEB 221, when it refused to recommend a different health plan on Conrail than PEB 219 had recommended nationally. According to the Report of PEB 221, such a difference "could detract from the fiscal vitality of the National Plan," and have a "destabilizing" effect on the relationship between employers and employees.

**2. Rules**

 The Court believes that the rules cannot be assessed in isolation but only as they were actually presented in this case, in the carriers' and BMWE's § 6 notices alongside the wages and benefits issues.[17] Had the rules been brought as a stand-alone issue the Court is not sure it could conclude that

---

16. To allow a party to establish that a certain form of bargaining was practical and appropriate by showing that it has long been the historical experience would merge the requirements of *Atlantic Coast Line* and alter the test requiring that both be demonstrated. Such a situation would raise the potential that a party could be locked into a certain form of bargaining merely by beginning that form of bargaining.

17. The parties seem to agree that the eleven rules subjects addressed by PEB 219 are at the heart of this wages and rules movement. These include (1) away-from-home expenses, (2) rate progression, (3) starting times, (4) meal periods, (5) alternate work weeks and rest days, (6) subcontracting, (7) reporting site/travel time rules, (8) intra-craft jurisdiction, (9) combining and realigning seniority districts, (10) regional and system gangs, and (11) work force stabilization.

national handling was obligatory. In fact, the carriers concede that looking at the rules alone is a much closer call. However, the Court finds that it must address the issue as it was presented—in a general wages and rules movement. First, the parties are in agreement that all issues in the current wages and rules movement should be negotiated as a package rather then separately. *See* 883 F.Supp. at 762; Inj. Hr'g tr. at 38–39. Moreover, the courts which have previously considered the question have reached a similar conclusion. In *Delaware & Hudson Ry. v. UTU*, 450 F.2d 603 (D.C.Cir.), *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971), the court of appeals concluded that particular rules issue, including crew consist, were "sufficiently germane" to wages as to "require handling at the same time and manner as the wage issue." [18] 450 F.2d at 609–10, n. 14. In *IAM v. NRLC,* 310 F.Supp. 905, Judge Corcoran found the practicality of handling wage disputes on a national level readily apparent, and moreover, because of a history of handling national movements "whether for wages or rules" on a national basis, the Court found national handling for the entire dispute was obligatory, without a detailed analysis of the history of each particular rule.

The carriers argue that a review of history also supports national handling of the current wages and rules movement. *See* Plaintiffs' Statement of Material Facts ¶¶ 79–81. In the past, rules proposals have been handled together with wage proposals in national multi-employer bargaining. In fact, there is evidence in the record supporting the carriers' assertion that it has been the BMWE which has sought national handling of the rules issues, including the most recent wages and rules movement in 1988. This, the carriers argue, is persuasive proof that there is nothing about these particular rules issues which requires local handling. The carriers suggest that their belief in the appropriateness of the national handling of rules issues is supported by the findings of the Presidential Emergency Board 98, which held in 1952

that disposing of national movements on a wide variety of rules changes was "firmly established."

According to the carriers, the practical appropriateness of national handling of the rules issues is grounded in the interrelationship between rules and economic issues:

> In this case, the BMWE seeks increases in wages, cost of living adjustments, and benefits, along with reimposition of the restrictive and outdated work rules revised under PEB 219's recommendations. The carriers seek wage and benefit adjustments that would. bring at least some semblance of a reasonable relationship to compensation paid in other industries [ ] and the elimination of all impediments to efficiency and competitiveness under existing rules, which increase the carriers' costs and their ability to fund wage and benefits increases.

Plaintiffs' Brief at 18. Moreover, the carriers argue that the practical appropriateness of national handling is amply demonstrated by the tight control that the union has exercised over its local bargaining. In particular, the carriers note that the Grand Lodge prepared a single draft notice applicable to all carriers; the Grand Lodge has scripted all correspondence between the General Chairmen and the carriers; and the President retains the power to veto any local agreement and has allegedly exercised that power three times already.

This Court finds that the rules proposals at issue here are sufficiently germane to require handling at the same time as the wages and health and welfare issue. First, there is the practical point that to hold otherwise would place the central issue in any negotiation—wages—"into an alien mode of negotiation"—in favor of the less significant issue. In other words, to let rules dictate the form of bargaining would be tantamount to allowing the tail to wag the dog. Secondly, the carriers correctly argue that the right to negotiate wage issues nationally would be meaningless if it could be destroyed merely by making a counter-proposal regarding

---

**18.** The Court recognizes that *Atlantic Coast Line* which was written by Judge Leventhal appears to require an issue by issue analysis. However, Judge Leventhal also wrote *Delaware & Hudson*

which endorses the principle that, where germane, rules and wages should be handled together without such an evaluation.

rules. While BMWE's suggestion that national handling eliminates the union's right to employ self help remedies may be correct, read to its logical conclusion it is the same as saying national handling should never be obligatory, essentially rendering *Atlantic Coast Line* meaningless. The Court is unwilling to take that step today.

Most importantly, collective bargaining requires parties to be able to negotiate all issues on the table. In this context, it would be impractical to negotiate some issues on a national scale while dealing with others locally. Such a practice would be inconsistent with the type of give-and-take vital to the resolution of disputes. The Court is persuaded that the overwhelming evidence of the practical appropriateness of the national handling does not justify abandoning the practice merely because one side is dissatisfied with the results of the recent disputes. For that matter, the BMWE's predictions that the rules issues will not be resolved nationally is no reason to abandon a manner of resolving disputes that has been successful in the past.

**D. Cross–Motions For Summary Judgment**

The Court will grant the plaintiffs' motion for summary judgment and deny the defendant's motion for summary judgment. BMWE has failed to demonstrate that the carriers have violated the terms of the statute prohibiting interference, influence, or coercion with the designation of repre-

sentatives, or that § 2 Third allows them to dictate the terms of collective bargaining. Accordingly, the Court will deny the defendant's motion for summary judgment.[19] In sum, the BMWE has not demonstrated that as a matter of law they are entitled under § 2 Third to summary judgment.

On the other hand, the carriers are entitled to summary judgment. First, as this Court has discussed, the injection of the § 2 Third issue does not alter the Court's analysis under § 2 First. The BMWE maintains that even if the Court were to "misconstrue *Atlantic Coast Line* " and conclude it would compel national handling *if* it concluded national handling is practical and appropriate and supported by past practice—summary judgment would still not be warranted. The BMWE argues that "[i]f material facts are at issue, or though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Tao v. Freeh,* 27 F.3d 635, 639 (D.C.Cir.1994). The BMWE argues that the determination of what is practical and appropriate is (1) a question of fact, and (2) it has presented credible evidence that national handling is not practical or appropriate.[20]

However, summary judgment in favor of the plaintiffs is nonetheless warranted because § 2 First calls for an analysis under an objective standard rather than an assessment of subjective questions like good or bad faith. The question of what is practical and appropriate for the parties is a question of law. It is worth noting that neither *Atlantic Coast*

---

**19.** Because the Court has ruled that the defendant is not entitled as a matter of law to summary judgment it need not consider whether factual disputes exist. Moreover, there is no need to address additional arguments presented by the carriers for denying summary judgment to the BMWE, including whether applying NLRA principles the union's position is tactical, or in violation of § 2 First because centralized authority robs the locals of true bargaining authority.

**20.** The BMWE claims that the carriers' arguments regarding what is practical and appropriate are based on three assumptions which are no longer valid. First, while the BMWE concedes that it has engaged in national handling in one form or another for over 60 years, it argues that deregulation has totally changed the bargaining landscape. Moreover, according to the BMWE, since 1984 the carriers have raised many conten-

tious issues not previously bargained over. Second, the BMWE takes issue with the carriers' claim that agreements have been reached with the BMWE in all but one instance. The BMWE suggests that in cases where there have been contentious issues or attempts to alter the status quo, national handling has rarely resulted in an agreement. Finally, the BMWE argues that the carriers' claims as to the benefits to be gained by national handling are irrelevant. According to the BMWE the only issue raised by the carriers' "erroneous" construction of *Atlantic Coast Line* is whether national handling is practical and appropriate in enabling parties to reach agreements, notwithstanding its purported public policy benefits. Moreover, the purported benefits, avoidance of strikes and other self-help are integral parts of the statutory scheme.

*Line* nor any of the cases that subsequently applied the standard treated it as a question of fact inappropriate for a court's determination. Whether this is a historical accident or an intended consequence is guided by the circumstances in which these questions typically arise—in a dispute over facts or what facts mean. Applying this standard, the Court finds that in light of the practical appropriateness and the historical experience of national handling, such handling is obligatory under the Act.

## CONCLUSION

In considering this dispute the Court would be remiss if it were not to review what is actually the crux of this case. The BMWE has a concern that its leverage is substantially diminished by multi-employer bargaining. This stems from BMWE's belief that when it engages in multi-employer bargaining its right to self help is severely restricted when negotiations stall. As this Court has previously stated:

> The BMWE seems to be troubled by the fact that when a union is forced to bargain on a multi-employer basis, any strike threat raises such disastrous possibilities that the threat collapses from its own weight. A nationwide strike presents such a potent threat to interstate commerce that it immediately will draw Congress's attention to the dispute. The very real threat that Congress will intervene, stop a strike, and impose an agreement essentially removes the strike card from [the] union's hand. Without the strike card, the BMWE is concerned that it is destined to lose every round of collective bargaining because it cannot motivate the carriers to enter into a voluntary and favorable agreement. The BMWE holds out the hope that if it bargains with individual carriers, it will be able to once again rely upon a strike threat as a means of pressuring the carriers to reach favorable agreements while not attracting the ire of Congress.

883 F.Supp. at 763–64. The BMWE's belief is not wholly unfounded and certainly not lost on the carriers.

While the Court has acknowledged that potential intervention by Congress is a fact

of life under the RLA, *id.* at 764, it does cause this Court some concern. The right to engage in self-help is an integral part of the RLA, notwithstanding the RLA's stated desire to avoid such measures. Collective bargaining is a competitive process which by its nature reflects a give-and-take—an employer's money for an employee's work. The RLA and other labor statutes assign both the employer and employee certain rights and responsibilities that reflect the delicate balance that such negotiations entail. Any piecemeal alteration to this balancing act could result in a situation more akin to the unfairness of a soccer game played on a hill; one team forced to run up and one team permitted to run down. Similarly, the removal of a significant right on the part of one of the parties to collective bargaining creates an uneven playing field which is equally unfair. Congress, for reasons this Court does not question, has at times found it necessary to step in and deny unions the right to engage in self-help. The Court does not question the wisdom of these actions, however, statutes which as conceived contemplate resort to certain conduct should be revisited if the right to engage in that conduct is to be withdrawn on an ad hoc basis. This is the heart of BMWE's problem and it is for Congress to fix—not this Court.

## *ORDER*

For the reasons stated in the accompanying memorandum opinion is hereby

ORDERED that the motion for summary judgment of plaintiffs/counterclaim defendants is GRANTED; and it is further

ORDERED that the motion for summary judgment of defendant/counterclaim plaintiff is DENIED; and it is further

ORDERED that the defendant/counterclaim plaintiff is obligated under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, to bargain, and is hereby permanently enjoined and ordered to bargain, on a national-handling basis with the duly authorized group representative of the plaintiffs/counterclaim defendants with respect to all issues in the current wage and rules movement that com-

menced on or about November 1, 1994; and it is further

ORDERED that the BMWE may not lawfully resort to strikes and other forms of self-help relating to the major dispute or disputes arising from the parties' respective proposals in the round of bargaining that commenced on November 1, 1994, until thirty days have elapsed following termination of mediation by the National Mediation Board under § 5 First of the Railway Labor Act, 45 U.S.C. § 155 First, and completion of emergency board procedures is established under § 10 of the Act, 45 U.S.C. § 160; and it is further

ORDERED that the defendant, its divisions, lodges, locals, officers, General Chairmen, agents, employees, members, and all persons acting in concert with any of them, be, and they hereby are, permanently enjoined, from authorizing, encouraging, permitting, calling, engaging in or continuing any strikes, picketing, work stoppages, or other self-help against the plaintiffs relating to the dispute or disputes arising from the § 6 notices served in the round of bargaining that commenced on or about November 1, 1994, before the expiration of thirty days following termination of mediation by the National Mediation Board under § 5 of the Railway Labor Act ("RLA"), and completion of emergency board procedures thereafter if an emergency board is established under § 10 of the RLA; and it is further

ORDERED that the defendant shall make all reasonable efforts to prevent its divisions, lodges, locals, officers, General Chairmen, agents, employees, members, and all persons acting in concert with any of them from engaging in conduct enjoined by this injunction, and shall discipline those who engage in such conduct.