**BURLINGTON NORTHERN AND SANTA FE RAILROAD CO., et al., Plaintiffs,**

v.

**UNITED TRANSPORTATION UNION, et al, Defendants.**

**General Committee of Adjustment GO–386, et al., Plaintiffs,**

v.

**Burlington Northern and Santa Fe Railroad Co., et al., Defendants.**

**Nos. CIV.A. 99–3117 EGS, CIV.A. 00–00043 EGS.**

United States District Court, District of Columbia.

March 28, 2001.

---

---

Ralph Joseph Moore, Jr., Donald J. Munro, Shea & Gardner, Washington, DC, for plaintiffs.

Clinton Joseph Miller, III, Cleveland, OH, Robert S. Clayman, Joseph Guerrieri, Jr., Guerrieri, Edmond & Clayman, P.C., Washington, DC, for United Transp. Union.

Michael Stephen Wolly, Zwerdling, Paul, Leibig, Kahn, Thompson & Wolly, P.C., Washington, DC, for Intern. Brotherhood of Locomotive Engineers.

## MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

## I. INTRODUCTION

Burlington Northern and Santa Fe Railway Company (BNSF) is a common carrier as defined under the Railway Labor Act (RLA), 45 U.S.C. § 151 *et. seq.* The National Carriers' Conference Committee (NCCC) represents BNSF and several other railroads in labor negotiations under the RLA. United Transportation Union (UTU) represents conductors, trainmen, firemen, and yardmasters employed by BNSF under the RLA for collective bargaining and other matters. UTU is composed of 11 General Committees of Adjustment, authorized under UTU's constitution to make and interpret labor agreements with representatives from transportation companies.

## II. PROCEDURAL HISTORY

NCCC sent a notice to UTU under Section 6 of the RLA proposing changes to rates of pay, rules, and working conditions embodied in various collective bargaining agreements with UTU. Three of the General Committees have asserted the right under the RLA to bargain with BNSF over the proposed changes. BNSF maintains that the General Committees do not have the right to bargain individually over the proposed changes, but must instead bargain through the national negotiators selected by other UTU General Committees around the country who have decided to bargain on a concerted basis.

BNSF and other carriers bargaining through NCCC filed suit against UTU seeking declaratory and injunctive relief to require the three General Committees that wish to bargain individually to bargain with BNSF and other NCCC-represented carriers on a national basis (through the national negotiators selected by UTU) and to require UTU to bargain on a craft-wide basis. (Civil Action No. 99–3117). The three General Committees then filed suit against BNSF and NCCC seeking declaratory and injunctive relief to prevent BNSF and NCCC from forcing a bargaining agent on the General Committees that they do not wish to select and to prevent BNSF from changing, through its bargaining with UTU's negotiators, the agreements that the three General Committees argue they are authorized to make and maintain. (Civil Action No. 00–0043). UTU, the three General Committees, and BNSF have all filed motions for summary judgment.

Since the filing of these lawsuits, UTU's national negotiators have commenced bargaining with BNSF on behalf of all of the other General Committees and a tentative agreement has been reached. The three

General Committees that are parties to these lawsuits did not participate in the bargaining.

## III. DISCUSSION

### A. Standard of Review for Cross Motions for Summary Judgment

Upon consideration of cross motions for summary judgment, the Court may grant such a motion if the moving party is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975). The Court finds that the cross motions present no genuinely disputed material facts that would preclude a grant of summary judgment in this case.

### B. Standing to Sue

■ The carriers argue that the Committees are without standing to object to national handling. They argue that if UTU is the rightful bargaining representative for the employees only UTU has a legal interest in this dispute. They assert that the Committees have no right to designate a bargaining representative and thus have suffered no injury capable of judicial redress. The carriers also argue that the Committees are not within the zone of interest protected by the RLA

because the RLA's focus is to protect the carriers and the employees, not the Committees.

The carriers arguments are without merit. Under UTU's constitution, the Committees are the chosen representatives of the employees. Additionally, they have been authorized to make and maintain the specific scheduling agreements subject to change. They have a stake in whether national handling is found to be obligatory because it will severely diminish their voices at the bargaining table. The Court finds that UTU and the Committees have standing to bring this lawsuit under the RLA.

### C. The Railway Labor Act

■ Under the RLA, both the carriers and their employees have a duty to "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions" in order to avoid any interruption to commerce. 45 U.S.C. § 152 First.[1] By giving notice pursuant to 45 U.S.C. § 156 ("Section 6 notice"), either party can propose a change in its agreement. The RLA protects the right of both the carriers and the employees to designate their own representatives for bargaining "without interference, influence, or coercion by either party over the designation of representatives by the other; ..." 45 U.S.C. § 152 Third.[2] Free-

---

1. Section 2 First states: "It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152 First

2. Section 2 Third states: "Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its

dom of choice in the selection of representatives by each side in a bargaining dispute is considered essential to the RLA's statutory scheme. *See Texas & New Orleans R.R. v. Brotherhood of Railway and Steamship Clerks*, 281 U.S. 548, 569, 50 S.Ct. 427, 74 L.Ed. 1034 (1930). The RLA defines the term "representative" to mean any person, union, or organization designated by a carrier or by its employees to act for it. 45 U.S.C. § 151.

The two main issues in these cases are: 1) who will represent the parties at the bargaining table, and 2) where will the bargaining take place-locally or through national handling.[3]

The main case in the D.C. Circuit addressing the issue of national handling is *Brotherhood of Railroad Trainmen v. Atlantic Coast Line Railroad*, 383 F.2d 225 (1967). However, this case did not address a party's right to choose its bargaining representative under Section 2 Third or the interplay between Sections 2 First and Third. In *Atlantic Coast Line*, the carriers argued that national handling is mandatory under the RLA; the union

argued that national handling is never mandatory. The court rejected both arguments and instead adopted a more individualized approach. The court held: "What constitutes good faith bargaining in the railroad industry is colored by how parties have actually bargained in the past. The Railway Labor Act does not universally and categorically compel a party to a dispute to accept national handling over its protest. Such bargaining is certainly lawful, however. Whether it is also obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and of the historical experience in handling any similar national movements." *Atlantic Coast Line*, 383 F.2d at 229. The court went on to find that based on the history and circumstances presented in the case, national handling was not required.

The relationship between Sections 2 First and Third was addressed for the first time in this circuit in *Alton & Southern Railway v. Brotherhood of Maintenance Way Employees*, 928 F.Supp. 7 (D.D.C. 1996).[4] In that case, the district court

employees as their representatives of those who or which are not employees of the carrier." 45 U.S.C. § 152 Third.

3. National handling is a form of multi-employer bargaining by a group of carriers bargaining with a union or a group of unions for a single agreement that will apply to all those who participate in the bargaining. Rail carriers that wish to engage in national handling do so through NCCC. If a carrier wishes to bargain with other carriers it authorizes NCCC to bargain on its behalf. Unions also have procedures to enable their constituent parts to bargain together. Under UTU's constitution, the General Chairpersons of the Committees that represent different groups of employees can form a "concerted movement."

4. In many ways, this case was similar to the cases presently before the Court. The plaintiffs were a group of rail carriers. The defendant was a union representing workers employed by the carriers. The carriers designated NCCC to act as their national multi-employer bargaining representative in negotiations with the unions, including BMWE. BMWE wanted to bargain locally with individual carriers. The carriers sought declaratory judgment obligating the union to bargain on a national handling basis with NCCC. BMWE and its individual General Chairmen sought declaratory judgment that it was not obligated to participate in multi-employer bargaining and that the carriers' insistence on multi-employer bargaining interfered with BMWE's right to designate its bargaining representative. Although other circuits have come to different conclusions regarding compulsory multi-employer bargaining, the district court applied *Atlantic Coast Line*.

The carriers argued that the facts of the case made national handling obligatory under

found that *Atlantic Coast Line* required the court to make an objective determination as to what is reasonable and appropriate based on how the parties actually bargained in the past notwithstanding the representation issue. The court was reluctant to allow the introduction of the representation issue to defeat national handling. The court reasoned that if Section 2 Third could be used to defeat national handling, a party could always raise a representation issue in order to neutralize the holding of *Atlantic Coast Line* and prevent national handling from ever being imposed.

## D. Parties' Arguments

### 1. UTU

UTU argues that it has the right to designate its own bargaining representative under Section 2 Third of the RLA. UTU argues that the district court's decision in *Alton* is distinguishable from the present cases based on its factual background. In *Alton*, the BMWE itself, as the designate under the RLA, had determined to bargain on a local handling basis. In the present case, UTU is engaged in national handling under its own constitution.

UTU's constitution permits subordinate General Committees of Adjustment to be excused from national handling and to exercise their own rights under UTU's constitution to bargain with their carrier. Under UTU's constitution and internal structure, any resolution by UTU and the carriers in national handling will not apply to those General Committees that wish to bargain individually. UTU argues that permitting the General Committees to bargain directly with their individual carriers even though UTU itself is in national handling is the exercise of the right to designate one's own representative under Section 2 Third. UTU asserts that since it is not acting in bad faith and is not trying to thwart the bargaining process, it is not in violation of Section 2 First.

### 2. General Committees

The General Committees argue that following the carriers' reading of *Atlantic Coast Line* would permit the federal courts to intrude into the collective bargaining process, contrary to the Supreme Court's decision in *Chicago & North Western Railway v. United Trans–Portation Union*, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971). In *Chicago & North Western*, decided after *Atlantic Coast Line*, the Su-

---

the RLA. BMWE argued that as long as its desire to bargain locally was reasonable and not taken in bad faith, the court could not disturb it. BMWE reasoned that under *Atlantic Coast Line* the court's role was limited to assessing whether the decision to bargain locally was so unreasonable as to evidence bad faith. If the party was not acting in bad faith then Section 2 Third-prohibiting interference with a party's choice of bargaining representative-trumps the duty to exert every reasonable effort contained in Section 2 First.

The court rejected BMWE's argument and found that *Atlantic Coast Line* required the court to make an objective determination as to what is reasonable and appropriate based on how the parties actually bargained in the past.

The court then went on to analyze the Section 2 Third representation issue. However, the court applied *Atlantic Coast Line* notwithstanding the representation issue. The court was reluctant to allow the introduction of the representation issue to defeat national handling. The Opinion reasoned that otherwise a party would always be able to raise a representation issue in order to neutralize the holding of *Atlantic Coast Line* and prevent national handling from ever being imposed.

The court held that Section 2 Third protects a union's right to name the representative of its choice, but does not entitle that party to dictate other aspects of the bargaining process.

preme Court addressed the obligations of the parties under Section 2 First holding that a union's strike could be enjoined if it could be shown that the union did not try to reach an agreement in good faith. Thus, the Committees argue that the extent of the federal court's authority in enforcing Section 2 First is to determine whether the party is acting in bad faith. If the court determines that the party is not acting in bad faith, then the court's intrusion into the collective bargaining process must end. The Committees then argue that since they are not acting in bad faith, the inquiry into Section 2 First ends and Section 2 Third controls.

The Committees maintain that Section 2 Third controls where the party objecting to the designation of a national bargaining agent does so before bargaining begins— that a federal court cannot preclude legitimate bargaining proposals by one side before bargaining even begins.[5] If the decision to object to national bargaining is not a legitimate bargaining proposal and is made in bad faith, then Section 2 First controls and prevents such action.

The Committees point out that while the question of the relationship between Section 2 First and Section 2 Third was not addressed in *Atlantic Coast Line*, it has arisen in two circuit courts and several district courts all of which concluded, with the exception of the district court in *Alton*, that Section 2 First did not limit Section 2 Third. These courts held that a party could object to national handling before negotiations began. *See, e.g., American Railway & Airway Supervisors Ass'n v. Soo Line R.R.*, 891 F.2d 675 (8th Cir.1989); *United Transportation Union v. Grand Trunk Western Railroad Co.*, 901 F.2d 489 (6th Cir.1990).

In *American Railway & Airway Supervisors Ass'n v. Soo Line R.R.*, the unions tried to force a railroad into national handling. 891 F.2d at 675. The railroad argued that Section 2 Third gave it the right to select its own representative to bargain on a local basis and not to be bound by any national agreement. The Eighth Circuit did not rely on *Atlantic Coast Line* and ultimately ruled in favor of the railroad by relying on Section 2 Third.

The Committees also argue that they should prevail even if the Court accepts the reasoning of the district court in *Alton*. In *Alton*, the court ruled that for Section 2 Third to be consistent with *Atlantic Coast Line*, Section 2 Third must be viewed as "intended to protect the *identity* of the representative, not the scope of his or her representation." 928 F.Supp. at 16 (emphasis added). Here, the Committees argue, it is the identity of their bargaining agent that is at issue.

The General Committees do not want UTU's national negotiators to bargain for them because it would diminish their influence in the negotiations. Under UTU's constitution, the three General Committees may participate in national handling only through UTU's national negotiating committee acting as their bargaining agent. By participating in national handling through UTU, the Committees give up their right to decide on their own whether to accept or reject any proposed agreements.

Additionally, the Committees argue that it is the carriers that are in violation of Section 2 First by refusing to confer with them over the Section 6 notices as the

---

**5.** The Committees also point out that in *Atlantic Coast Line* the party seeking to avoid national handling served Section 6 notices on multiple carriers, but in this case, the party seeking to compel national handling served the Section 6 notice in an attempt to compel the other party's bargaining agent in violation of Section 2 Third.

carriers are not exerting every reasonable effort to settle the dispute.

### 3. The Carriers

The carriers argue that *Atlantic Coast Line* is the governing law in this circuit and that the Court is required to determine under the test set forth in *Atlantic Coast Line* whether national handling is obligatory in this circumstance. The carriers argue that the court in *Alton* correctly interpreted and applied *Atlantic Coast Line* and that the good faith test advocated by the General Committees should be rejected. Additionally, they argue that nothing in the Supreme Court's *Chicago & North Western* decision undercuts *Atlantic Coast Line* because in that decision the Court merely counseled the federal courts to exercise judicial restraint, but did not say it was improper for courts to find national handling obligatory.

The carriers argue that they prevail even if the Committees standard-that the parties can unilaterally withdraw from multi-employer bargaining prior to the start of negotiations absent bad faith-is applied.[6] The carriers argue that a union withdrawal from multi-employer bargaining must be total to be effective under *Pacific Coast Ass'n of Pulp & Paper Manufactures,* 163 N.L.R.B. 892, 1967 WL 19171 (1967).

Finally, the carriers argue that UTU cannot hide behind its own internal procedures and constitution because they do not supercede UTU's statutory duty under the RLA to engage in national handling. The carriers argue that UTU's constitution does not exempt the Committees from federal law. The carriers demand regarding national bargaining only concerns how bargaining is to take place, not who must participate.

### E. Analysis

UTU is the duly designated bargaining representative under the RLA for the crafts and classes of firemen, conductors, and trainmen on BNSF. UTU operates in accordance with its constitution. Under UTU's constitution, each General Committee of Adjustment has autonomy over the negotiation and application of collective bargaining agreements that apply to the employees under that Committee's jurisdiction. For geographic and other reasons, the interests and concerns of some General Committees are different from those of other General Committees.

Under UTU's constitution, UTU has a national negotiating committee appointed by UTU's international president that carries out national handling on behalf of UTU. However, under Article 91 of the constitution, any General Committee that wants to opt out of national handling has the right to do so and to bargain individually.

The language of *Atlantic Coast Line* seems to lend itself, in some regards, to the objective type of analysis used by the district court in *Alton.* However, the decision in *Atlantic Coast Line* said relatively little about how to determine good faith and reasonableness or what standard should be applied. It does say, however, that what constitutes good faith depends on how the parties actually bargained in the past. The court in *Alton* interpreted this language to mean that the court should make an objective assessment of the parties past bargaining practices. However, the plain language could also mean that the court should use the history

---

**6.** Although it should be noted that the Committees are not attempting to withdrawal from multi-employer bargaining because at the time these lawsuits were filed, the bargaining had not yet begun, a distinction that the Committees argue is important.

of past bargaining between the parties to determine if one party is presently acting in bad faith.

*Atlantic Coast Line* must be interpreted in the context of subsequent Supreme Court precedent. Moreover, since *Atlantic Coast Line* did not address Section 2 Third of the RLA, this court must look to other judicial interpretations of Section 2 Third.

In *Chicago & Northwestern Railway,* decided three years after *Atlantic Coast Line,* the Supreme Court held that Section 2 First created an enforceable legal obligation on carriers and employees. This case dealt with whether federal courts could issue strike injunctions, rather than whether they could compel national handling. The Court stated that "the obligation under Section 2 First is central to the effective working of the Railway Labor Act. The strictest compliance with the formal procedures of the Act is meaningless if one party goes through the motions with 'a desire not to reach an agreement.'" *Chicago & Northwestern Railway,* 402 U.S. at 578, 91 S.Ct. 1731. In a footnote the Court states that "great circumspection should be used in going beyond cases involving 'desire not to reach an agreement,' for doing so risks infringement of the strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements." *Id.* at 579 n. 11, 91 S.Ct. 1731. The language of this case suggests that courts can and should look to the subjective intent of the parties when enforcing Section 2 First.

The district court in *Alton* was reluctant to look at reasonableness from each party's subjective perspective: "Parties could consistently come to court with diametrically opposed views of what was reasonable from their point of view, and likewise regularly disagree about their choices of a bargaining forum. To engage in a subjective analysis would transfer the dispositive determination from the courts to the parties." *Alton,* 928 F.Supp. at 14. However, Section 2 First is not aimed at providing the courts with an avenue to control how bargaining will take place. Rather, Section 2 First addresses the behavior of the parties engaged in the bargaining process.

Section 2 First requires a party to "exert every reasonable effort to make and maintain agreements. . . ." 45 U.S.C. § 152 First. Both parties could behave reasonably and act in good faith, but still disagree about whether to bargain nationally or locally. On the other hand, if one party insists on bargaining locally in an effort to avoid reaching an agreement, that party would be acting in bad faith, would not be exerting every reasonable effort, and could be compelled by a court under Section 2 First to bargain on a national handling basis. In *Chicago & North Western,* the Supreme Court found that the courts are capable of making determinations about whether an action taken or omitted was in good faith. 402 U.S. at 579, 91 S.Ct. 1731.

The analysis used by the district court in *Alton* diminishes Section 2 Third. The court rejected the notion that Section 2 Third protects both the right of a party to select the identity of its representative and the attached right to determine the structure of the collective bargaining, because such a reading would always allow a party to avoid national handling contrary to *Atlantic Coast Line.* In *Alton,* the court found that Section 2 Third only protects a party's right to select the identity of its representative. However, the identity of the representative and the structure of the bargaining cannot always be separated. In some cases, such as these, one necessarily effects the other.

In some respects the Section 2 Third issue is more squarely presented in these

cases than it was in *Alton*. What is at issue in these cases is the employees' method, through UTU, of designating their own bargaining representative. The employees designate their representative through UTU's internal constitution. Section 2 Third protects a party's right to designate its representative without interference, influence, or coercion. The carriers argue that this court should only be concerned with the United States Constitution, not UTU's constitution. However, UTU's constitution cannot be ignored. The employees choice to bargain through the General Committees-their choice of representative-is being challenged and it is UTU's constitution that provided the procedure and method for that choice.

These cases are also different from the previous cases in this circuit because the General Committees are not attempting to withdraw from national handling. Rather, in these cases, the dispute between the General Committees, UTU, and the carriers regarding who should bargain and how arose before any bargaining had begun. This is not a situation where one party is attempting to withdraw after national handling has begun. Several courts have found national handling to be obligatory *after* the parties had commenced national bargaining. However, this is not the scenario that is presented here.

 The Court finds that UTU and the three General Committees have not acted in bad faith in violation of Section 2 First. They have not acted with a desire not to reach an agreement. UTU has followed its internal constitution and procedure for selecting its bargaining representative. Additionally, the three General Committees are not driven by a desire to thwart the bargaining process. Rather, the Committees have legitimate reasons for wanting to bargain locally and to reach individual agreements. The three General Committees have legitimate local issues that they feel will be ignored at the national bargaining table.

If the parties were already engaged in national handling when this dispute arose, and the three General Committees refused to bargain further unless the carriers would negotiate local agreements, the situation might be different. However, here the dispute arose before any bargaining began. This Court finds that under these circumstances, where UTU and the General Committees have legitimately designated representatives under Section 2 Third and are not acting in bad faith, the RLA does not authorize the Court to dictate the conditions under which the parties must bargain before any bargaining has even begun.

F. System-wide, Craft-wide Bargaining

The carriers make the additional argument that employees under the RLA cannot insist on less than system-wide, craft-wide bargaining. They argue that UTU is the designated representative for BNSF's employees and thus speaks for the entire craft. The carriers argue that the National Mediation Board (NMB) has specifically held that UTU may not negotiate through its Committees, but rather must designate a representative with system-wide authority to bargain.

The carriers argue that the language of Section 2 Fourth-that the majority of any craft or class shall determine who "*the* representative" is-makes it clear there shall be a singular representative. 45 U.S.C. § 152 Fourth (emphasis added). The carriers assert that the Supreme Court in *Steele v. Louisville & Nashville R.R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), confirmed that there should be a singular representative by stating that the representative chosen by the majority of a craft represents the entire craft. The

carriers argue that they are not interfering with the employees choice of representative, only that the representative chosen have authority to bargain for the entire class or craft.

The Committees argue that there is no requirement under the RLA that agreements apply system-wide. They point to the D.C. Circuit's decision in *Association of Flight Attendants, AFL–CIO v. USAir,* 24 F.3d 1432, 1437 (D.C.Cir.1994), "that nothing in the RLA *per se* requires employees of the same craft or class in a particular system to be subject to the same terms and conditions of employment."

Additionally, the Committees argue that the NMB has no adjudicatory power and that it does not have the authority to determine the scope of bargaining under Section 2 First or who is a designated bargaining agent under Section 2 Third.

Finally, the Committees argue that the Section 6 notice proposes changes to the collective bargaining agreements that the Committees are designated and authorized to maintain. Those agreements are preserved by the Interstate Commerce Commission (ICC) to protect the interests of employees who were affected by the numerous mergers that have formed BNSF. The Committees assert that the merger orders of the ICC prevail when they conflict with other laws, such as the RLA. *Norfolk & Western Railway v. American Train Dispatchers Ass'n,* 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991).

The Seventh Circuit has held: "The language in Section 8 of the Employees Merger Protection Agreement to the effect that existing collective bargaining agreements can be changed in accordance with the procedures of the Railway Labor Act does not automatically render applicable the NMB's policy determination under the act that a class of craft bargaining unit must be system-wide in scope. Unless a representation determination is made pursuant to the Act, the voluntary agreement by plaintiff to recognize a collective bargaining representative of a class or craft that is not system-wide will be given effect." *Burlington Northern v. American Railway Supervisors Ass'n,* 503 F.2d 58, 63 (7th Cir.1974).

The carriers are correct that the language of Sections 2 Fourth and Ninth suggests that there is to be a single representative. They are also correct that the NMB has determined that representation under the RLA must be on a system-wide, craft-wide basis. Additionally, the Supreme Court has held that the representative of a craft must represent all its members, not just the majority. *Steele,* 323 U.S. at 192, 65 S.Ct. 226.

■ The carriers' point to "Merger Procedures" promulgated by the NMB that allowed carriers to request a NMB investigation to determine the appropriate union representative. The board agreed that UTU should have a single representative for each system-wide craft or class, rather than the fractional representation of General Committees. *See Burlington Northern R.R.,* 18 N.M.B. 240 (1991). However, the D.C. Circuit held *en banc* that the NMB's Merger Procedures were invalid because the NMB had exceeded the scope of its authority under the RLA. *See Railway Labor Executives' Ass'n v. National Mediation Board,* 29 F.3d 655 (D.C.Cir. 1994) The NMB has no authority to determine the representative of a union when the issue is raised by a carrier. The carriers argue that because UTU withdrew from the appeal, the NMB's decision regarding UTU's General Committees still stands. However, the NMB's decision is certainly very weak authority given that the D.C. Circuit held that the NMB was

acting without authority when it made this decision.

 The Committees are correct that the RLA does not require that all the employees of the same craft or system be subject to the same terms of employment. *See USAir,* 24 F.3d at 1432. However, whether all the members of a certain class or craft must bargain together under one representative is a slightly different question. The Seventh Circuit case cited by the Committees is persuasive. This case suggests that under the circumstance presented in these cases, the RLA does not require that bargaining be craft-wide or system-wide. *See Burlington Northern,* 503 F.2d at 58.

## IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that defendant United Transportation Union's Motion for Summary Judgment in Civil Action No. 99–3117 is **GRANTED.** It is further

**ORDERED** that plaintiff Burlington Northern and Santa Fe Railway Company's Motion for Summary Judgment in Civil Action No. 99–3117 is **DENIED.** It is further

**ORDERED** that plaintiff General Committee of Adjustments' Motion for Summary Judgment in Civil Action No. 00–0043 is **GRANTED.** It is further

**ORDERED** that defendant Burlington Northern and Santa Fe Railway Company's Motion for Summary Judgment in Civil Action No. 00–0043 is **DENIED.** It is further

**ORDERED** that the Clerk shall enter final judgment for the defendant and against the plaintiff is Civil Action No. 99–3117. It is further

**ORDERED** that the Clerk shall enter final judgment for the plaintiff and against the defendant in Civil Action No. 00–0043.

**IT IS SO ORDERED.**