**BROTHERHOOD OF RAILROAD TRAINMEN, Appellant,**

v.

**ATLANTIC COAST LINE RAILROAD COMPANY et al., Appellees.**

**No. 20718.**

United States Court of Appeals District of Columbia Circuit.

Argued May 15, 1967.

Decided Sept. 6, 1967.

Mr. Milton Kramer, Washington, D. C., with whom Messrs. Martin W. Fingerhut, Washington, D. C., and John H. Haley, Jr., St. Louis, Mo., were on the brief, for appellant.

Mr. Francis M. Shea, Washington, D. C., with whom Mr. Richard T. Conway, Washington, D. C., was on the brief, for appellees.

Messrs. David G. Bress, U. S. Atty., David L. Rose, Walter H. Fleischer and John C. Eldridge, Attorneys, Department of Justice, filed briefs on behalf of the United States as amicus curiae, urging reversal.

Before BASTIAN, Senior Circuit Judge, TAMM and LEVENTHAL, Circuit Judges.

1. *See* Brotherhood of Railroad Trainmen v. Akron & Barberton Belt R.R. Co., 128 U.S.App.D.C. ——, 385 F.2d 581

**LEVENTHAL, Circuit Judge:**

This appeal involves still another phase of the railroad work rules dispute that erupted again in 1959 when the nation's major carriers served notices under Section 6 of the Railway Labor Act, 45 U.S.C. § 156 (1964), to abrogate existing rules regulating the use of conductors and trainmen, or "crew consist," on yard and road crews. We have recently recounted the events that followed this opening round.[1] It suffices here to say that in 1960 the Brotherhood of Railroad Trainmen (BRT) served counter notices insisting that not less than one conductor and two trainmen be employed on all road and yard crews, negotiations and mediation proved unsuccessful, and only Congressional intervention and provision for compulsory arbitration forestalled a strike in 1963.

The arbitration award of Board 282 apparently failed to achieve one of its purposes, of guiding the way to a general, long range settlement.

In June and July of 1965 the BRT, anticipating the expiration of the arbitration award in January 1966, served identical notices on some eighty carriers embodying the same proposal they had made in 1960. The carriers responded that these notices were premature in insisting on bargaining during the pendency of the arbitration award, but in December 1965, without waiving their prematurity objection, those eighty carriers plus some twenty others served notices on the BRT proposing the same management-discretion rule they suggested in 1959. No genuine conferences had been held on either group of notices when the carriers obtained injunctions prohibiting a strike over their failure to bargain on the union's allegedly premature notices. We recently reversed the grant of this relief in a decision (see note 1), holding that the union's notices were not in law premature.

(May 12, 1967, Supplemental Opinion July 31, 1967.)

In the meantime, conferences were taking place on the local properties, and some agreements were reached. The carriers had requested that the BRT acquiesce in their suggestion that if local negotiations bore no fruit, the dispute be referred to "national handling." From the outset the BRT refused to concur in this request. When local conferences broke down on various roads, the services of the National Mediation Board were invoked. The Board ignored a request by the carriers that mass mediation be scheduled, and instead docketed each dispute separately.

In November 1966, appellees, the Atlantic Coast Line Railroad, the Boston & Maine Corporation, and the Des Moines Union Railway, sued in the District Court for declaratory and injunctive relief against a possible strike on the grounds that the BRT first, had not participated in good faith negotiations at the local level, and, second, had breached a statutory obligation by refusing the request for national handling. The District Court after a trial rejected the first contention, but granted the relief sought on a finding that the Railway Labor Act authorized the carriers to demand national handling. In the context of this dispute we disagree, and accordingly we reverse.

## I

### Defense of Res Judicata

Before proceeding to the merits, we encounter the BRT's timely assertion that the carriers' prayer for relief was barred by the principle of *res judicata*, and in particular its manifestation in the doctrine of merger. The essence of this contention is that after the carriers procured their original injunction in January 1966, based on the supposed prematurity of the notices and the absence of any responsibility of the carriers to bargain prior to that time, the carriers filed a motion for supplemental relief in which they sought and obtained a ruling

that genuine conferences still had not taken place. The BRT argues that the carriers could then have raised, and therefore were then obliged to raise, any objection to the refusal to go to national handling.

■■ It is a well-settled and virtually axiomatic rule of sound judicial administration that a party having several alternative grounds for relief arising out of a particular transaction does not have the privilege of litigating his theories one at a time, holding one in reserve while he presses another to judgment. According to the complementary principles of bar and merger, whether a party loses or wins relief in his initial action, the judgment embodies all his rights stemming from the transaction involved, and he is foreclosed from later seeking relief on the basis of issues he might have raised in the prior proceeding to support the original claim.

The question in this case, however, is whether the carriers could have and should have raised the national handling problem in their April 1966 motion for supplemental relief. The transcript of the hearing on that motion reveals clearly that the District Court specifically inquired of counsel for the carriers whether he was urging as a violation of the BRT's duty under the Act its refusal to accept national handling. Counsel replied that he was "not urging that at this time." The BRT contends that this indicates that the dispute had materialized sufficiently to oblige the carriers to join this basis for their claim that bona fide conferences were not taking place.

■ In two recent cases we applied the principle of *res judicata* to cut off objections made by the BRT in litigations involving other carriers.[2] But we do not think it appropriate to invoke that principle against the claim of appellee carriers in this case. The carriers' motion for supplemental relief was based on the

2. *See* Brotherhood of Railroad Trainmen v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 127 U.S.App.D.C. ——, 380 F. 2d 605 (May 19, 1967); Brotherhood of Railroad Trainmen v. St. Louis Sw. Ry. Co., 127 U.S.App.D.C. ——, 380 F.2d 603 (May 19, 1967).

District Court's reservation of jurisdiction to construe and effectuate its judgment pronouncing the 1965 notices premature. The carriers sought a declaration that genuine conferences had not yet taken place. They did not have an obligation at that time to expand the relief they were seeking, even though the BRT was on record as opposing the demand for national handling, for this demand by the carriers was conditioned on the failure of local conferences, and it was not yet clear that genuine, good faith local negotiations had been tried and exhausted. Added to the lack of ripeness at that time, there is a serious question about the propriety of introducing this issue in a motion for relief at the foot of the earlier decree, which was directed at very different questions. In this circumstance, we decline to dispose of the case on *res judicata* grounds.

## II

### National Handling and the Railway Labor Act

Coming to the merits, we conclude that the District Court erred in holding that the Railway Labor Act authorized the carriers to insist on national handling, of this issue.

We reject the positions of both parties on the issue whether the Railway Labor Act permits a party to demand that national movements (the coordinated efforts to establish similar rules on a large number of railroads) be referred to national handling. One party says always, the other says never. Instead we find persuasive a more individuated approach, akin to that suggested in the brief of the United States appearing as *amicus curiae* urging reversal, which we shall set forth after analyzing the views of the parties.

*The Carriers' Contention.* The carriers say that national handling is the common technique for dealing with national movements in the railroad industry.

They assert that national handling can be demanded as of right when similar proposals are served at about the same time by or upon a number of carriers. They lean on the language of Sections 1, Sixth, and 2, Second, of the Railway Labor Act,[3] and emphasize certain words, as will be indicated. Section 1, Sixth, defines "representative" as used in the Act to mean "any person or persons, labor union, organization, or corporation designated either by a carrier *or group of carriers* or by its or their employees, to act for it or them." Section 2, Second, declares that "disputes between a carrier *or carriers* and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier *or carriers* and by the employees thereof interested in the dispute."

The carriers also argue that the dominant purpose of the legislative scheme, avoidance of interruptions in the flow of interstate commerce, would be promoted by recognizing a right to demand national handling, since historically national strikes have been infrequent, due to the pressure of public opinion and the threat of congressional intervention.

*The BRT's Response.* The BRT also invokes statutory language, pointing to Section 2, Ninth.[4] That section authorizes the National Mediation Board to designate the bargaining agent for railroad employees and, as the Board itself has construed it, refers only to certifications of single carrier units. From this BRT concludes that the single carrier unit is the only required bargaining unit.

BRT also turns to the history of national handling and argues that in the past all parties have always recognized the national approach to be a voluntary one, when carriers and union have shared the opinion that it would be more efficient and conducive to a settlement to

3. 45 U.S.C. §§ 151, Sixth, 152, Second (1964).

4. 45 U.S.C. § 152, Ninth (1964).

bargain on a national scale. The union further contends that national handling of the crew consist issue, at least, ought not be found mandatory because past experience has demonstrated that it is unsuited to the prospect of successful settlement. And, finally, the BRT insists that even if it be assumed that national handling might be required on this issue in some circumstances, there must be an opportunity for withdrawal from national handling, and that here the union clearly signified its desire to bargain only on the local properties far enough in advance that it may not be compelled to accede to such handling now.

*The District Court Ruling.* The District Judge interpreted Sections 1, Sixth and 1, Second of the Act as "alone sufficient to sustain the position of the carriers," holding the Act authorizes and empowers the carriers "to bargain and negotiate as a group in any labor dispute cognizable under the Railway Labor Act."

█ It reviewed the recent instances of national consideration of the crew consist issue, and held that the service of identical proposals on some eighty carriers automatically demonstrates the continued appropriateness of national handling of this issue. This major premise of the District Court syllogism is not supportable in our view, and accordingly we reverse its conclusion that the present refusal to accept national handling constituted a bad faith abrogation of the BRT's statutory obligations.

---

██ It cannot be disputed that although the BRT and the carriers have occasionally discussed crew consist problems on a national scale, there has never been a national crew consist rule. That distinguishes the crew consist issue markedly, for example, from the national rule contained in the National Diesel Agreements governing the use of firemen. The thousands of existing crew consist agreements have been negotiated at the local level. This crucial distinction

was emphasized by the Presidential Commission appointed to investigate the conditions on American Railroads. *See* REPORT OF THE PRESIDENTIAL RAILROAD COMMISSION 54 (1962). That this has been the effective past practice, and promises the most encouraging likelihood for agreement, was reiterated by the Neutral Members of Board 282 who explained that it was in the light of this practical reality that they decided to remand the crew consist disputes to local negotiation, and if necessary to local arbitration. *See* Opinion of the Neutral Members, 41 LAB. ARB. 680, 682, 686–687, 693–698 (1964). These objective observers concluded forcefully: "A national prescription of crew size would be wholly unrealistic." 41 LAB. ARB. at 694. We would require a strong showing of continuous collective bargaining practice on a national scale before we find an obligation imposed by Congress to bargain on a basis deemed "wholly unrealistic" by objective boards officially deputized to study the underlying problems and formulate appropriate dispositions. The procedures of the Act are purposefully long and drawn out to afford the maximum inducement to peaceful settlement, but the Act does not require efforts clearly at war with reality.

██ What constitutes good faith bargaining in the railroad industry is colored by how parties have actually bargained in the past. The Railway Labor Act does not universally and categorically compel a party to a dispute to accept national handling over its protest. Such bargaining is certainly lawful, however. Whether it is also obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and of the historical experience in handling any similar national movements. The history and realities of crew consist bargaining in this industry impel the conclusion that mass handling was not required by the statute for bargaining on that issue.

The conclusion that appellant breached its statutory obligation was not warranted, and the issuance of an injunction was improper.

Reversed.