BURLINGTON NORTHERN & SANTA FE RAILWAY CO. et al.,
Plaintiffs,

v.

UNITED TRANSPORTATION UNION, Defendant.

General Committee of Adjustment GO–386, et al., Plaintiffs,

v.

Burlington Northern & Santa Fe Railway Co., et al.,
Defendants.

Civil Action Nos. 99CV3117RBW, 00CV0043RBW.

United States District Court, District of Columbia.

Nov. 7, 2003.

John O'Brien Clark, Jr., Highsaw, Mahoney & Clarke, Washington, DC, for General Committee of Adjustment.

Ralph Joseph Moore, Jr., Shea & Gardner, Washington, DC, for Burlington Northern & Santa Fe Railway Company.

Clinton Joseph Miller, III, Cleveland, OH, Robert S. Clayman, Joseph Guerrieri, Jr., Guerrieri, Edmond & Clayman, P.C., Washington, DC, for United Transportation Union.

Michael Stephen Wolly, Zwerdling, Paul, Leibig, Kahn & Wolly, P.C., Washington, DC, for International Brotherhood of Locomotive Engineers.

### *MEMORANDUM OPINION* [1]

WALTON, District Judge.

These matters are currently before the Court on the parties' cross motions for summary judgment. For the reasons set forth below, the Court will grant summary judgment to the plaintiffs in case number 99cv3117 and will enter summary judgment for the defendants in case number 00cv0043.

## I. Background

### A. Factual Background[2]

The disputes in these cases arise under the Railway Labor Act, 45 U.S.C. §§ 151–188 ("RLA" or "the Act"), which governs negotiations between railway carriers and their employees. Burlington Northern & Santa Fe Railway Company ("Burlington") is a common carrier as defined by the RLA. 45 U.S.C. § 151. Burlington, along with several other railway common carriers ("the carriers") filed suit against the

1. The Court held a status hearing in this matter on October 14, 2003, at which time it directed questions to the parties' counsel which it needed to have them address prior to issuing this Memorandum Opinion.

2. Although the factual background concerning these matters was outlined in the opinion of another judge of this Court and in the Circuit Court's opinion, the Court will further elaborate on the facts to provide a more detailed understanding of the events that preceded the filing of the complaints in these actions.

United Transportation Union ("UTU"), which represents "certain crafts or classes of [the carriers'] employees, including trainmen, firemen, engineers, conductors and yardmasters, for purposes of collective bargaining and other matters arising under the RLA." Complaint for Declaratory and Injunctive Relief filed in *Burlington Northern & Santa Fe Ry. v. United Transportation Union,* ("Burlington Compl.") ¶ 4. The lawsuit resulted from the UTU's delegation of its bargaining authority to several of its committees,[3] which then decided to opt out of national bargaining with the carriers and instead insisted on bargaining locally.

To fully understand the nature of the controversy, a detailed review of the circumstances underlying the parties' dispute is necessary. Because collective bargaining agreements do not normally contain expiration dates, the timing of when parties can propose changes to the agreements are contained in "moratorium clauses," which memorialize the parties' intentions not to seek changes in the terms of the agreements "prior to a specific future date." Carriers' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("Carriers' Stmt.") ¶ 5. Pursuant to § 6 of the RLA, once a railway employer or the representatives of the employees seek to change the terms "affecting rates of pay, rules, or working conditions" of the parties' collective bargaining agreement, the party seeking the changes must serve a written notice, referred to as a "Section 6 notice," on the other party so that a conference can be scheduled at which time the parties can attempt to reach an agreement regarding the proposed changes. 45 U.S.C. § 156.

Once the notice has been served, bargaining between the employer and its employees can take one of two forms. The first form of bargaining is referred to as " 'local bargaining' or 'local handling.' " Complaint for Declaratory Judgment and Injunctive Relief filed in *General Committee v. Burlington Northern and Santa Fe Railway Company* ("Gen.Comm.Compl.") ¶ 12. Local bargaining or handling occurs where the "General Chairman of the Committee that served or was served with the notice and the highest officer of the carrier designated to handle such notices[ ]" conduct a conference to bargain over the proposed changes to the agreement. *Id.* The second type of bargaining, referred to as "national bargaining" or "national handling," takes places when there is "multi-employer bargaining between the bargaining representative for a group of carriers and either a bargaining committee of the union representing the interested employees of those carriers, or a bargaining committee comprised of representatives of several unions interested in the bargaining." *Id.*

Pursuant to 45 U.S.C. § 152 Third, each party to a collective bargaining agreement may designate a representative to represent its interests during the bargaining negotiations. Sometime prior to November 1, 1999, the UTU had designated the General Committees of Adjustment GO–386, GO–245, and Go–291 ("the Commit-

---

**3.** The UTU was composed of 11 General Committees of Adjustment. Three of these committees—GO–386, GO–291, and GO–245—are the plaintiffs in civil action 00cv0043. However, since the decision by the Circuit Court in these matters, GO–291 has merged into GO–386. Carriers' Memorandum of Points and Authorities on Motion for Summary

Judgment ("Carriers' Mem.") at 7. Furthermore, the carriers indicate in their motion for summary judgment that GO–245 has stated its intention to dismiss its claims in case 00cv0043. *Id.* Thus, only one committee, GO–386, continues to object to national handling in this matter.

tees") "to represent brakemen, conductors, engineers, foremen, and yardmen employed by [Burlington] who are covered by collective bargaining agreements administered" by each "General Committee." Gen. Comm. Compl. ¶¶ 1–3. These three Committees informed Burlington that they were not going to participate in "national handling because they [had] concluded that the interests of the employees they represent will be best served by bargaining individually with [Burlington]." *Id.* ¶ 17.

On or about November 1, 1999, the Chairman of the National Carriers' Conference Committee ("NCCC"), which had been designated by Burlington to represent its interests, Burlington Compl. ¶ 17, sent a notice pursuant to § 6 of the RLA to the UTU's International President Charles L. Little, informing him "that the carriers represented by the NCCC, including ... [Burlington], were proposing under Section 6 of the [RLA] changes to agreements affecting rates of pay, rules, and working conditions applicable to employees represented by the UTU, including [Burlington's] employees...." Gen. Comm. Compl. ¶ 18.

Because the employees had designated the three General Committees to represent their interests, President Little responded to the NCCC's § 6 notice indicating that he was not the proper person to whom the § 6 notice should have been sent, and as required by § 6, the notice should "be served on the UTU General Chairperson(s) [of each of the three General Committees] with jurisdiction...." *Id.* ¶ 19. In response to President Little's correspondence, defendant Burlington advised the General Chairmen of the Committees that it had " 'joined with other railroads in authorizing the [NCCC] to represent them with respect to the 2000 wages, rules and benefits round of collective bargaining on a concerted *national*

basis....' " *Id.* ¶ 20 (emphasis added). The General Committees responded by indicating that they had not designated the "UTU National Negotiating Committee to bargain on their behalf" and that they did not intend to bargain nationally, but wanted to bargain "directly and exclusively with ... [Burlington] through whomever ... [Burlington] might designate[ ] and authorize as its bargaining representative...." *Id.* ¶ 21.

Since the parties could not reach an agreement regarding whether the committees could opt to bargain locally, on November 24, 1999, Burlington and several other railway carriers filed suit against the UTU and the International Brotherhood of Locomotive Engineers in the matter styled *Burlington Northern and Santa Fe Ry. v. United Transportation Union,* 99cv3117("the *Burlington* case"). Subsequently, on January 7, 2000, the three General Committees of Adjustment—GO–386, GO–291, and GO–245—filed their complaint against Burlington in the action titled *General Committee of Adjustment GO–386 v. Burlington Northern and Santa Fe Ry.,* 00cv0043 ("the *General Committee* case"). Both cases were assigned to another judge of this Court who issued an order consolidating these cases on April 26, 2000. On March 28, 2001, the prior judge issued a Memorandum Opinion and Order denying summary judgment to Burlington in both cases and granting summary judgment to Burlington's opponents in both cases. Burlington appealed. The Circuit Court held that this Court's colleague "did not properly apply the governing law," *General Comm. of Adjustment, GO–386 v. Burlington Northern & Santa Fe Ry.,* 295 F.3d 1337, 1341 (D.C.Cir.2002), and therefore vacated the judgement and remanded the cases to this court "for further proceedings consistent with [its] opinion." *Id.* These matters were then reassigned to this judge.

Prior to the Circuit Court's ruling, "the General Committees served separate § 6 notices on the carriers." Carriers' Stmt. ¶ 24. Representatives of the carriers and the General Committees had met pursuant to an order of the other district judge, and discussed national negotiations and other issues, but no agreement resulted from these discussions. *Id.* Meanwhile, national bargaining between the NCCC and the UTU continued, "without prejudice to each side's position as to the UTU's obligation to bargain nationally on behalf of all employees it represents." *Id.* ¶ 25. The result of these negotiations was the negotiation of a "tentative national agreement" which was subsequently ratified by 76 percent of the UTU's separate crafts of employees. *Id.* ¶ 26. This agreement was signed by the UTU and the carriers on August 20, 2002, however, Burlington has not applied the terms of the new agreement to those employees represented by the General Committees involved in this litigation, pending a ruling from this Court. *Id.* ¶¶ 26, 30. A new moratorium bars the service of any new § 6 notices until November 6, 2004. *Id.* ¶ 27.

## B. The Parties' Arguments

The carriers and the unions have each filed motions for summary judgment. The carriers contend that based on the Circuit Court's ruling, there are two questions for this Court to resolve: (1) whether the UTU had an obligation "to engage in . . . national handling during the 1999 wage and rules movement on behalf of all the employees it represents on the participating railroads"; and (2) "whether the UTU could insist on bargaining with one partic-

ular railroad . . . [,]Burlington[,] . . . through local sub-committees, each claiming to represent only a fragment of certain crafts of employees of [Burlington], or whether it was obligated to bargain on a craft-wide, system-wide basis." Carriers' Memorandum of Points and Authorities on Motion for Summary Judgment ("Carriers' Mem.") at 1.[4]

According to the carriers, the answer to the first question is yes and the answer to the second is no. Regarding the issue of national handling, the carriers argue that pursuant to the test set forth in *Brotherhood of Railroad Trainmen v. Atlantic Coast Line R.R.*, 383 F.2d 225 (D.C.Cir. 1967), which the Circuit Court held governs these matters, "there can be no genuine dispute that national handling was obligatory for the 1999 wage and rules movement." Carriers' Mem. at 2. Regarding the issue of craft-wide system bargaining, the carriers argue that UTU violated the RLA by "delegating its authority to sub-committees that insist on bargaining for only a piece of a single railroad[,]" when Burlington had proposed changes that would affect "*all* UTU represented employees across the entire railroad system." *Id.* at 3. This is so, according to the carriers, because "both § 2 First and § 2 Fourth of the RLA clearly preclude the UTU from insisting on bargaining for less than an entire craft where—as here—the railroad is proposing craft-wide changes." *Id.* at 4.

In their cross-motion for summary judgment, the lone Committee[5] in this action with interests that are still adverse to those of the carriers, argues that neither

---

4. Actually, this Court must only decide the first question in the carriers' favor to end this dispute. As the carriers correctly note in their motion, the Circuit Court did not rule on the merits of the carriers' argument regarding the requirement that the union engage in craft-wide bargaining and this argument is an

"entirely independent basis for summary judgment in the carriers' favor." Carriers' Mem. at 33.

5. As indicated above, there is only one Committee that continues to object to national

the RLA nor the Circuit Court's ruling in *Atlantic Coast Line* mandate that it engage in national handling. GO–386 argues that the UTU's delegation of its bargaining authority to it does not violate the RLA for several reasons: First, GO–386 argues that Section 2 Third protects a union's right to delegate its bargaining authority to bargaining agents and thus the UTU had the right to delegate its authority to GO–386. Memorandum of Law in Support of Plaintiff GO–386's Cross–Motion for Summary Judgment and in Opposition to the Carriers' Motion for Summary Judgment ("GO–386's Mem.") at 23–24. Second, GO–386 states that the UTU's bargaining agents collectively have system-wide authority and thus, Burlington's argument that the UTU has violated the RLA by failing to designate a bargaining agent with authority to bargain for the entire unit must be rejected. *Id.* at 28.

Regarding the *Atlantic Coast Line* test, which GO–386 reluctantly concedes governs this dispute despite the Circuit Court's ruling, *id.* at 38, GO–386 argues that application of that test to this case mandates a conclusion that "national handling of the proposed changes to the agreements ... is not obligatory...." *Id.* at 41. Thus, GO–386 argues that it is entitled to summary judgment because "no reasonable trier of fact could find that multi-employer bargaining over the changes that ... [Burlington] and GO–386 (including former GO–291) have proposed be made ... is reasonably calculated to bring the parties to agreement on the issues that are important to GO–386." *Id.* at 21. On the other hand, GO–386 argues

that the carriers are not entitled to summary judgment because "it is clear that a reasonable trier of fact *could* conclude that multi-employer bargaining is *not* reasonably calculated to bring about a resolution to the disputes raised by [the parties'] proposed agreement changes." *Id.* at 22 (emphasis added).[6]

## II. Analysis

### A. Summary Judgment Standard

Both sides have moved for summary judgment. The court may grant summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 321–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In resolving a motion for summary judgment, all reasonable inferences that may be drawn from the facts before the Court must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must grant a motion for summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### B. Whether the General Committees were obligated to engage in national handling of the 1999 notices

#### 1. The Prior Rulings in this Case

This Court's task of determining the proper standard to apply in deciding

---

handling in this matter, GO–386. *See* footnote 3 *supra* at 2.

**6.** Defendant UTU filed a response to the carriers' motion for summary judgment in which it conceded that "[t]he UTU's position throughout this action has been that the Carriers' insistence on national handling is contrary to Section 2, Third of the [RLA]." Response of

United Transportation Union to the Carriers' Motion for Summary Judgment ("UTU Opp'n") at 2. Therefore, "[b]ecause the Court of Appeals has held that Section 2, Third 'is not the governing provision' in this matter ... the UTU [notes that it] has nothing further to offer." *Id.*

whether summary judgment is warranted in these matters has been simplified by the Circuit Court's ruling. The district judge previously assigned to these cases had ruled that the *Atlantic Coast Line* decision was not applicable to the dispute between the parties and because the UTU had the right to "designate[ ] representatives under Section 2 Third[ [7]] and [were] not acting in bad faith, the RLA d[id] not authorize the Court to dictate the conditions under which the parties must bargain before any bargaining ha[d] even begun." *Burlington Northern & Santa Fe R.R. v. United Transp. Union,* 141 F.Supp.2d 49, 58 (D.D.C.2001). In addition, the court held that "under the circumstance[s] presented in these cases, the RLA does not require that bargaining be craft-wide or system-wide." *Id.* at 60 (citing *Burlington Northern v. American Ry. Supervisors Ass'n,* 503 F.2d 58 (7th Cir. 1974)).

In reversing the prior district court ruling, the Circuit Court framed the issue before it as "a relatively straightforward one." *General Comm.,* 295 F.3d at 1339. The issue for this court to resolve, the court of appeals held, is "when and under what circumstances may a carrier or union under the RLA compel an opposing party to bargain on a national or local level, as chosen by the party seeking to compel the negotiations?" *Id.* The Circuit Court rejected this Court's colleague's view that the issue presented "involv[ed] '[t]he relationship between sections 2 First[ [8]] and Third' of the RLA." *Id.* at 1340 (citing

*Burlington,* 141 F.Supp.2d at 53) (other citation omitted). Rather, the Circuit Court stated that

[t]he issue before us ... is the scope of bargaining—that is, whether it is locally or nationally handled—not the related but distinct question of designation of the bargaining representative. Thus, our decision in *Atlantic Coast Line* provided governing precedent on the question before the District Court.

*Id.* Accordingly, the Circuit Court remanded the cases for application of the *Atlantic Coast Line* standard.

### 2. The *Atlantic Coast Line* Standard

In *Atlantic Coast Line,* the carriers had served Section 6 notices on a union proposing "to abrogate existing rules regulating the use of conductors and trainmen, or 'crew consist,' on yard and road crews." 383 F.2d at 226. The carriers argued that this issue, which they described as a national movement, had to be resolved by national handling in all circumstances, while the union argued that the issue should never be presented for national handling. *Id.* at 228. In rejecting both parties' positions, the court concluded that "a more individuated approach" was the appropriate process to adopt. *Id.* Under this approach, the court held that

[w]hat constitutes good faith bargaining in the railroad industry is colored by how parties have actually bargained in the past. The [RLA] does not universally and categorically compel a party to

---

7. Section 2 Third provides in pertinent part:

Representatives ... shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives.

45 U.S.C. § 152 Third.

8. Section 2 First provides, in pertinent part:

It shall be the duty of all carriers ... and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes ... in order to avoid any interruption to commerce or to the operation of any carrier....

45 U.S.C. § 152 First.

a dispute to accept national handling over its protest. Such bargaining is certainly lawful, however. Whether it is also obligatory will depend on an issue-by-issue evaluation of the practical appropriateness of mass bargaining on that point and of the historical experience in handling any similar national movements.

*Id.* at 229. In the case before it, the *Atlantic Coast Line* court concluded that "[t]he history and realities of crew consist bargaining in this industry impel the conclusion that mass handling was not required by the statute for bargaining on that issue." *Id.*

Subsequent decisions have applied the *Atlantic Coast Line* test to cases arising under the RLA involving the question of whether or not to mandate national handling. *See, e.g., Alton & Southern Ry. v. Brotherhood of Maintenance Way Employes,* 928 F.Supp. 7 (D.D.C.1996) (Hogan, J.); *United Transp. Union v. Burlington N., Inc.,* 325 F.Supp. 1125 (D.D.C. 1971) (Parker, J.); *Int'l Ass'n of Machinists & Aerospace Workers v. Nat'l Ry. Labor Conference,* 310 F.Supp. 905 (D.D.C.1970)(Corcoran, J.), *appeal dismissed,* 463 F.2d 872 (D.C.Cir.1972); *Chicago, Burlington Quincy R.R. v. Railway Employes' Dep't,* 301 F.Supp. 603 (D.D.C. 1969) (Robinson, J.).

■ As indicated in the *Alton* decision, which the Circuit Court cited with approval in its decision regarding these cases, *General Comm.,* 295 F.3d at 1340, the *Atlantic Coast Line* decision requires this Court to apply a two part test to determine whether GO–386 was obligated to engage in national handling. This test requires the Court "to assess (1) whether the parties have a long history of negotiating in a particular way; and (2) whether it is still appropriate to require the parties to continue to negotiate that way." *Alton,* 928 F.Supp. at 13. It is only if the answers to both of these questions are in the affirmative that this "[C]ourt is authorized to find a particular form of bargaining is obligatory under the Act." *Id.* In making this determination, " § 2 First calls for an analysis under an objective standard rather than an assessment of subjective questions like good or bad faith. The question of what is practical and appropriate for the parties is a question of law." *Id.* at 19.[9]

**(3) The Parties' Negotiations History**

■ There were three matters at issue in the 1999 round of bargaining, which were designated in the carriers' § 6 notice: wages, benefits, and work rules. Carriers' Mem. at 24–31. The carriers assert that over the past "seven decades the UTU and its predecessor unions have engaged in national handling of concerted movements like the current wage and rules movement

---

**9.** Despite the Circuit Court's ruling in the instant cases, GO–386 nonetheless argues that "Section 2 Third is still relevant here...." It is not. The Circuit Court clearly held "that Section 2 Third is not the governing provision." *Gen. Comm.,* 295 F.3d at 1340. That section, which covers the designation of bargaining representatives by the parties, although related, is distinct from the required scope of bargaining in which the parties' representatives must participate. As the *Alton* court stated, reading Section 2 Third as "protect[ing] both the right of a party to select the identity of its representative and the attached right to determine the structure of the collective bargainining[,]" would be

akin to a party naming as its bargaining representative someone who speaks only a foreign language, and then expecting all subsequent negotiations to be conducted in its representatives' native tongue. Section 2 Third protects a union's right to name the representative of its choice, but it does not entitle that party to dictate other aspects of the bargaining process.

928 F.Supp. at 16.

under the [RLA]." Carriers' Mem., Volume ("Vol.") II: Carrier Witness Declarations, Declaration of A. Kenneth Gradia Regarding the Historical Experience and Practical Appropriateness of National Handling of Wage and Rules Movements ("Gradia Decl.") ¶ 8. The union does not dispute the historical experience of the parties, however, it argues that the parties' "past history shows that since the 1980's GO–386 *has been attempting* to bargain over rules that it considers to be important to its members." GO–386's Mem. at 38 (emphasis added).[10] However, what GO–386 has been attempting to do and what the actual past history of the parties demonstrates are two different matters. Burlington states that the history of negotiating wages pursuant to national handling dates back to 1932 when "the nation's carriers and 20 railway unions, including all four of the UTU's predecessors, signed a national agreement providing for a wage reduction, in response to the Great Depression." Carriers' Stmt. ¶ 42. In 1934, this national agreement was extended in another agreement providing for the "eventual phased-in restoration of wages to 1931 levels." *Id.* Although the UTU was not established until the late 1960's as a result of the merger of four operating crafts, in the 1934 agreement, "four predecessors of the UTU, along with most of the other national rail unions, signed [the] agreement [which] recommend[ed] [also] that all future concerted general wage movements should be handled nationally—as they have been ever since." Gradia Decl. ¶ 8; *see also* Carriers' Stmt. ¶ 43 ("the UTU and its predecessors have handled general wage adjustments nationally in every general movement in which those unions have been involved.").[11] Significantly,

> [w]ithin a decade after the 1934 agreement recommending that general wage movements should be handled nationally, it became the practice of the UTU's predecessors to engage in national handling of fringe benefits and major work rules issues with economic significance in general movements along with wages.

10. Specifically, the union points to its experience in the 1988 round of bargaining, which was ultimately resolved by Public Law No. 102–29, and the 1994 round of bargaining in which GO–386, GO–245, and GO–291 indicated that they did not wish to participate in national handling and were excused by the UTU. General Committee GO–386's Counter-statement of Undisputed Material Facts in Support of Committee's Cross–Motion for Summary Judgment and Statement of Disputed Material Facts in Opposition to Carriers' Motion for Summary Judgment ("GO–386's Stmt.") ¶ 27. In 1994, the three committees eventually filed suit against Burlington and other carriers seeking a declaratory judgment that the carriers were interfering with the union's right under Section 2 Third of the RLA to designate its own bargaining agent. *Id.* ¶ 31. This dispute was eventually settled. *Id.* ¶ 32. Because of the outcomes of the 1988 and 1994 bargaining rounds, namely, one that was resolved by the adoption of legislation and the other that resulted in a settlement, neither provides guidance as to how the present dispute should be resolved and they most certainly do not impact the overwhelming historical negotiations experience that exists between the parties. Therefore, even though GO–386 states that it "has not participated in a concerted wage or rules movement since its belated entry into the 1984 concerted movement[,]" GO–386's Stmt. ¶ 61, this does not alter the substantial history of the parties' prior dealings.

11. Notably, GO–386 "does not dispute Carrier's Stmt. ¶¶ 43–45, except to note that GO–386 did not participate in national handling of wages during the 1984 round of bargaining until near the end of that bargaining and has not participated in national handling of wages since the agreement resolving the 1984 round of bargaining." Gen. Comm.'s Stmt. ¶ 67. GO–386 also notes that other carriers have not participated in national handling, however, the practices of other parties does not have any bearing on the prior history of the parties before the Court.

The practice of handling general wage and rules movements like the current one nationally has continued ever since. Gradia Decl. ¶ 9.

The Court concludes that the historical practice of the parties has been to engage in national handling of the matters identified by the carriers' § 6 notice. The situation here is similar to the one presented in *Alton,* where the court concluded that national handling was mandatory. There, twenty-nine rail carriers filed suit against the Brotherhood of Maintenance of Way Employees ("BMWE"), a union that represented workers employed by the carriers. 928 F.Supp. at 10. Both parties had served Section 6 notices upon the other proposing changes in wages, health and welfare benefits, and work rules. *Id.* The rail carriers were, as are the carriers here, represented by the NCCC. *Id.* As in this case, the union "rejected the idea of multi-employer bargaining, seeking instead to bargain locally with the individual carriers." *Id.* In holding that the union was obligated to participate in national handling, the *Alton* court first rejected the union's claim that the issue was whether the carriers were violating Section 2 Third of the RLA by refusing to meet with the union's individual representative. *Id.* at 15. The court stated that it was "not convinced that the rights of a union under § 2 Third include the right to determine the manner under which negotiations will occur." *Id.* The court expressed its appreciation concerning "the significance of § 2 First['s] ...," *id.,* requirement that carri-

ers "exert every reasonable effort to make and maintain agreements concerning the rate of pay, rules and working conditions" of its employees "and to settle all disputes ... between the carrier and [its] employees ...," 45 U.S.C. § 152 First. It nonetheless concluded that it could not "find within [the provision's] language the right to dictate the terms under which collective bargaining will occur." *Id.* Critical to this conclusion was the fact that the case before the court "[did] not involve allegations of an employer acting in a manner that seeks to injure a union or affect that union's confidence in a choice of representative." *Id.*[12]

In holding that the past history of the parties supported a finding that national handling should be obligatory in the current round of bargaining, the *Alton* court stated that it appeared from the record " 'that the carriers and the BMWE have generally participated in national handling of issues concerning wages and health and welfare benefits.' " *Id.* at 16 (citation omitted). As further support for its conclusion, the court stated that there was

substantial evidence in the record that [sic] is has been the historical practice of these parties to handle wage and health and welfare movements nationally. In particular, since 1932 wage adjustment issues have been handled nationally and no less than twenty-seven national agreements have been reached.... It has also been the historical experience

---

**12.** Also of importance was the *Alton* court's rejection of the Eighth Circuit's reasoning in *American Railway & Airway Supervisors Ass'n v. Soo Line R.R.,* 891 F.2d 675 (8th Cir.1989), which GO–386 also relies on in this case. In *Soo Line,* the Eighth Circuit declined to apply the *Atlantic Coast Line* two-part test and held that the carrier there had the right to withdraw from national bargaining prior to the

initiation of the bargaining process. *Id.* This Court's colleague also relied on *Soo Line* in rendering his decision. Accordingly, because the *Soo Line* court explicitly refused to apply the *Atlantic Coast Line* test to the situation before it, *Soo Line* provides no guidance to this Court in deciding the issues before it in this case.

of the parties to handle health and welfare proposals nationally.

*Id.* at 17 (citation omitted).

As in *Alton*, GO–386 cannot dispute the fact that it has historically submitted the issues currently before the Court to national handling. History therefore favors the carriers' position.

### (4) The Appropriateness of Continuing National Handling

The union's strongest argument at this juncture is that national handling would not be appropriate in this instance because it would not permit the union to address issues of local concern to its members. Neither party can dispute that the initial § 6 notice served by the carriers addressed wages, fringe benefits and work rules. *See* Gradia Decl., Ex. 4 (Carriers' § 6 Notice dated November 1, 1999). With the exception of the three Committees that have been the subject of the dispute in the matters before the Court, the remainder of the UTU's Committees served identical § 6 notices on the carriers. *See* Gradia Decl., Ex. 5 (UTU's § 6 Notice dated November 10, 1999). The carriers argue that the matters that need to be subject to bargaining, namely, the issues of wages, benefits and local rules, have typically been the subject of national handling. The carriers further opine that because the rules are "germane" to the compensation issues, "then national handling is obligatory as to the entire movement." Carriers' Mem. at 24. The Court agrees with the carriers' position.

In *Alton*, the court concluded that wages were an issue particularly appropriate for national handling because "[o]bviously if wage adjustments were to be handled on an individual carrier basis, each carrier would be deterred from settling because [of] the possibility that a competing carrier might obtain better terms[.]" 928 F.Supp.

at 17. In addition, the *Alton* court noted that national handling was particularly appropriate for "health and welfare plans, in part, because structural changes in plan benefits can be implemented only by the national policyholders of the plans." *Id.* Furthermore, even in the absence of "structural problems" the court stated that "the give-and-take required of legitimate local negotiations over health and welfare as well as other issues would be incompatible with the survival of national plans." *Id.* As to the issue regarding the rules, which the union in *Alton* argued were vital to the negotiations on the other issues, the court stated that "the rules cannot be assessed in isolation . . . ." *Id.* Because in *Alton*, as in the cases presently before this Court, the rules issue was presented in a general wages and rules movement, the court held that the rules issue was also subject to national handling. *Id.* at 18. The court reasoned

> that the rules proposals at issue . . . [were] sufficiently germane to require handling at the same time as the wages and health and welfare issue. First, there is the practical point that to hold otherwise would place the central issue in any negotiation—wages—'into an alien mode of negotiation'—in favor of the less significant issue. In other words, to let rules dictate the form of bargaining would be tantamount to allowing the tail to wag the dog. Secondly, the carriers correctly argue that the right to negotiate wage issues nationally would be meaningless if it could be destroyed merely by making a counterproposal regarding rules.

> While BMWE's suggestion that national handling eliminates the union's right to employ self help remedies may be correct, read to its logical conclusion[,] it is the same as saying national handling should never be obligatory, essentially

rendering *Atlantic Coast Line* meaningless.

*Id.* at 18–19.

GO–386 argues that because its main issue concerns the local rules of its members, national handling is not obligatory. GO–386's Mem. at 40. At the hearing held in this matter on October 14, 2003, counsel for GO–386 argued that although this case did not initially concern only local rules, it has by necessity become just that. This is now the posture of the case, counsel argued, because what GO–386 seeks to do at this point is to take advantage of the 2002 national agreement concerning wages and benefits but bargain separately for local rules. Although it rejected the reasoning of *Alton* in most respects, GO–386, as support for its position, points to language in the *Alton* decision where the court stated that "[h]ad the rules been brought as a stand-alone issue the Court [was] not sure it could conclude that national handling was obligatory." 928 F.Supp. at 17–18.[13]

However, the *Alton* court also indicated that in the case before it, "the rules [could not] be assessed in isolation but only as *they were actually presented* ... in the carriers' and BMWE's § 6 notices alongside the wages and benefits issues." *Id.* at 17 (emphasis added).

Likewise, the issues presented in this case were presented as a general wages and rules movement. Although GO–386 may now be willing to forego its insistence on local handling regarding the wages and benefits issues, this does not alter the fact that the issue presented to this Court was whether national handling should have been mandatory based on the content of the carriers' § 6 notice.[14] The Court concludes it was.[15] *See United Transportation Union*, 325 F.Supp. at 1131 ("The Court conclude[d] that national handling of the fireman manning dispute [was] obligatory in [the] negotiations [before the court] because of the 'practical appropriateness of mass bargaining' and the 'historical experi-

---

**13.** GO–386 notes that it "has not proposed any wage changes" and that the rules are now the essence of its concern. GO–386's Mem. at 39–40. However, Burlington's Section 6 notice addressed the wages and benefits issue, as did the other Committees' § 6 notices. *See* Carrier's Stmt., Ex. 13 (Section 6 Notice submitted by GO–386). Notably, GO–386 states that "the 2002 National Agreement does not resolve the main health and welfare issue.... [.]" GO–386's Mem. at 40, which is an issue that is appropriate for national handling. This cuts against GO–386's position concerning the rules.

**14.** Although the remaining UTU General Committees served virtually identically § 6 notices in November 1999, due to this litigation, GO–386 opted out of national handling and did not serve a § 6 notice on BNSF until August 21, 2003. Supplemental Declaration of John D. Fitzgerald dated October 7, 2003 ("Supp. Fitzgerald Decl.") ¶ 2. This notice specifically proposed "establish[ing] 'assigned freight service operating between Vancouver, WA/Portland/ OR Terminal and Spokane, WA....' " *Id.* (quoting § 6 Notice).

**15.** The Court is unpersuaded by the union's argument that *Delaware & Hudson Ry. Co. v. United Transportation Union*, 450 F.2d 603 (D.C.Cir.1971), supports its argument "that national handling of the proposed changes to the agreements plaintiff GO–386 makes and maintains is not obligatory...." GO–386's Mem. at 41. GO–386 argues that this case "shows ... that the carriers are attempting to force GO–386 into a bargaining forum where GO–386 may raise its parochial issues but it may *not* bargain to impasse over those issues." *Id.* GO–386 essentially argues that national handling will not permit the use of a strike because "an effort to pursue single agreements may be taken as undercutting an obligation to conduct national bargaining in good faith." *Delaware & Hudson*, 450 F.2d at 611. However, the situation before the *Delaware & Hudson* court, namely a strike by the unions of selected employers in an effort to reach a national agreement, is not analogous to a situation where a *national agreement* cannot be reached due to the inability to resolve local issues. The *Delaware & Hudson* court's ruling does not address this situation.

ence' in these circumstances."); *Chicago, Burlington & Quincy R.R.*, 301 F.Supp. at 607 ("The subject matter of the parties' current dispute is one that has been handled, historically, on a multi-employer basis by the carriers' designated national representative and the unions.... When such a pattern of national bargaining has been established and the issues are not unique to the unions' dealing with any specific carrier, then both 'the practical appropriateness of mass bargaining on that point' and 'the historical experience' in handling the issue in the past make national handling of the matter obligatory.") (citing *Atlantic Coast Line*, 383 F.2d at 229).

The Court is not unsympathetic to the union's argument that national handling diminishes its bargaining power and thus may not be the most effective method of resolving local issues.[16] Similarly, in *Alton*, "[the employee's representative] ha[d] a concern that its leverage was substantially diminished by multi-employer bargaining." 928 F.Supp. at 20. The *Alton* court acknowledged this reality, stating that

'when a union is forced to bargain on a multi-employer basis, any strike threat raises such disastrous possibilities that the threat collapses from its own weight. A nationwide strike presents such a potent threat to interstate commerce that it immediately will draw Congress's attention to the dispute.'

*Id.* (citation omitted). However, the *Alton* court, while acknowledging the reality of the union's concern, stated that "the heart" of the union's problem was one for Congress, not the court, to fix. *Id.*

On this point, this Court is in agreement with the *Alton* court's reasoning. If in fact the union is correct that national handling has repeatedly been unresponsive to unions' local concerns and issues when raised in a collective wages and rules movement, perhaps Congress should amend the RLA to expressly provide mechanisms for addressing these concerns. However, the parties' historical bargaining practices and the fact that national bargaining was appropriate concerning the carriers' § 6 notices, which addressed

---

**16.** Despite this assertion, the Court is not convinced that local bargaining, even solely concerning the rules issues, would be the most appropriate bargaining process. Significantly, GO–386 does not represent all of Burlington's employees. Gradia Decl. ¶ 3. Thus, because the UTU and its remaining General Committees participated in national handling, permitting GO–386 to engage in local handling could result in some employees of the same employer obtaining a "better deal" than other employees. It could also result in strikes, which could possibly be the bargaining chip GO–386 is seeking to obtain through local handling. *See* Gradia Decl. ¶ 11 ("[I]n the past twenty-five years the UTU has struck only once in any nationally handled dispute.... Strikes over locally handled disputes have been far more frequent, prolonged and often more disruptive. Over the past 25 years, for example, more than 1,000 days of service were lost to the railroad industry due to strikes in locally handled disputes with various unions."). This is the exact result the

RLA was designed to prevent. *See Delaware & Hudson*, 450 F.2d at 607 ("The purpose and scheme of the [RLA] is to 'provide a machinery to prevent strikes' and the resulting interruptions of interstate commerce.") (footnote and citation omitted).

However, this obviously does not mean that local bargaining can never occur. As the carriers point out in their response to the supplemental declaration of John D. Fitzgerald, filed several days before the Court's scheduled status conference in this matter, " '[d]ual track' bargaining allows local officials to deal with local issues locally while national negotiators retain ultimate control of national issues and the overall economic package." Carriers' Reply to Motion by Plaintiff General Committee GO–386 for Leave to File Supplemental Declaration at 3. This option was declined by GO–386. *Id.* In addition, local handling of a rules dispute would appear to the Court most appropriate when, unlike here, the § 6 notice only raises a rules issue.

wages, benefits and rules, convinces the Court that the union was obligated to engage in national handling in the 1999 round of bargaining. Accordingly, summary judgment must be entered in favor of the carriers.[17]

■ The only issue remaining for the Court's resolution is what impact its ruling has on the membership of GO–386 in regard to the National Agreement that was signed by the UTU and the carriers on August 20, 2002. The agreement was ratified by 76 percent of the UTU's separate crafts of employees, Carriers' Stmt. ¶ 26, but GO–386 did not participate in the negotiations and its membership did not vote on its ratification. *Id.* ¶ 25. The carriers argue that the grant of summary judgment in their favor results in the GO–386's membership being bound by the 2002 National Agreement. The carriers opine that this result is called for because "[t]he UTU Constitution requires ratification by each of the separate 'crafts' of employees represented by UTU[,]" and therefore, "[e]ven if every employee within the jurisdiction of GO–386, GO–291, and GO–245 had voted against the agreement, it still would have been ratified." *Id.* In response to the carriers' position, GO–386 states that

> while [it] does not dispute the mathematical calculations in the Carriers' Statement at Paragraph 26, it submits that it is speculative and pure conjecture to assert that GO–386's, GO–245's, and GO–291's participation in the ratification vote—including their ability to communicate with other Committees—would not have affected the outcome of the ratification vote, especially when it is remem-

bered that the three Committees equal approximately 31.75% of the BNSF's 11,000 UTU represented employees.

GO–386's Stmt. ¶ 56.

Clearly, the wiser course for GO–386 would have been to participate in the national bargaining process with the understanding that its participation would not prejudice its rights regarding the matters at issue in these actions, which was the course taken by UTU. Because GO–386 failed to do so, the Court finds itself in the position of having to determine whether the 2002 National Agreement is binding on GO–386 even though it did not participate in the negotiations and its membership did not vote on its ratification. For several reasons the Court concludes that GO–386 is bound by the agreement.

First, GO–386's counsel represented at the hearing that was held in this matter that the committee wants to take advantage of the favorable benefits and wages package contained in the agreement,[18] although it still desires to negotiate separately for local rules. If the Court were to bifurcate the impact of the now ratified agreement in the manner described by GO–386, such a result would have the effect of permitting GO–386 to pick and choose those negotiated items that are to their liking (wages and benefits) without having the rules, which would have also been subject to the national negotiations, impacted by the agreement merely because it chose not to participate in the negotiations. This result would in effect grant GO–386 the relief it has been seeking all along—the right to engage in local

---

**17.** Due to the Court's ruling, it declines the carriers' invitation to address the issue of craft-wide bargaining as a ruling on that issue is not required to support the Court's conclusion that GO–386 should have engaged in national handling during the 1999 round of collective bargaining.

**18.** The 2002 National Agreement includes provisions containing a longevity bonus for eligible employees as well as a general wage increase. Carriers' Mem., Vol. I, Ex. 8 (Agreement of August 20, 2002).

handling.[19] Because these matters came to the Court in the context of a general wages and rules movement and the committee does not oppose accepting the terms of the ratified agreement as to wages and benefits, the Court holds that it should be bound by the terms of the national agreement in its entirety. Any other result would not only reward GO–386 for its refusal to engage in national handling of the carriers' notices, but also encourage other bargaining agents to adopt a similar posture in the future, which would potentially impair the ability of parties to resolve labor disputes within the railroad industry. This would not comport with the objectives of the RLA. *See* 45 U.S.C. § 153 First ("It shall be the duty of all carriers . . . and employees to exert every reasonable effort . . . to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier. . . .").

Second, the result this Court has reached is in accordance with the terms of the UTU's constitution. According to the declaration of GO–386's General Chairperson,

> if GO–386 were to participate in national handling, the decision whether to accept a proposed national agreement, which is a single agreement applicable to *all carriers* participating in national handling, would be made by the 'majority of the members voting of each of the crafts to be covered or affected by the terms of the proposed agreement. . . .' . . . Consequently, if GO–386 were forced to participate in national handling, its members could be covered by a new agreement even though they unanimously vote to reject the agreement so long as a majority of *all* voting

employees covered by the agreement nationwide vote to ratify the agreement. Fitzgerald Decl. ¶ 20; *see also id.* Ex. 1 (UTU Constitution, Art. 91). Thus, because the result the Court is ordering does not offend UTU's constitution, and in fact is consistent with it, the Court concludes that this remedy is the proper remedy to invoke in this case. Accordingly, all of the terms of the 2002 National Agreement are held to be applicable to the employees represented by GO–386.

### ORDER

In accordance with the Court's ruling as expressed in its Memorandum Opinion that accompanies this Order, it is hereby

**ORDERED** that the Carriers' Motion for Summary Judgment [# 62] in case number 99cv3117 is granted and summary judgment is entered in favor of the plaintiffs in case number 99cv3117. It is further

**ORDERED** that General Committee GO–386's Cross–Motion for Summary Judgment in case number 00cv0043 [# 47] is denied and summary judgment is entered in favor of the defendants in case number 00cv0043. It is further

**ORDERED** that the terms of the 2002 national agreement, which was ratified by the carriers and the UTU on August 20, 2002, is applicable to GO–386 and, pursuant to that agreement, no further § 6 notices may be served until November 6, 2004.

---

**19.** Ironically, the result that GO–386 now seeks, *i.e.,* local bargaining of the rules, was an option that had been presented to it by the carriers previously, and which GO–386 rejected. *See* footnote 16 *supra* at 25–26.